## WALTER VINSEN V. THE STATE.

No. 9414.   Delivered November 11, 1925.

**1.—Assault to Rape—Evidence of Intent—Not Sufficient.**

Where, on the trial for an assault to rape, the evidence establishes an outrageous assault, successfully resisted by the prosecutrix, the specific intent to have carnal knowledge of her without her consent is not sufficiently proven to overcome the presumption of innocence and reasonable doubt given to an accused on trial, by the laws of our State, and the conviction cannot be permitted to stand.

**2.—Same—Continued.**

The authorities in this State are uniform to the effect that in order to convict the defendant on a charge of an assault to rape, the evidence should not only show an assault, but that the defendant intended to gratify his passion on the person of the woman, and that he intended to do so at all events, notwithstanding any resistance on her part.

**3.—Same—Continued.**

These rules apply with the same force to a case involving the question as to whether there was an intent to gratify lust, with or without force. The nature of the charge presupposes that the intent was not carried out. It is therefore necessary that the acts and conduct of the person should be shown to be such that there can be no reasonable doubt as to the criminal intent. If the acts and conduct are equivocal, or consistent with the absence of the felonious intent charged in the indictment, then it is clear that they are insufficient to warrant a verdict of guilty. Following State v. Massey 86 N. C. 658.

Appeal from the District Court of Anderson County. Tried below before the Hon. Ben F. Dent, Judge.

Appeal from a conviction of an assault with intent to rape, penalty, four years in the penitentiary.

The opinion states the case.

*A. G. Greenwood,* for appellant.

*Sam D. Stinson,* State's Attorney, and *Nat Gentry, Jr.,* Assistant State's Attorney, for the State.

BERRY, JUDGE.—The appellant was convicted in the District Court of Anderson County of the offense of assault with intent to rape and his punishment assessed at four years in the penitentiary.

Lorraine Davis is the alleged injured party. She testified in substance that she had never met Walter Vinsen until he came to her house on the night of September 11, 1924, but that she had seen him prior to that time; that on that night he and one Nat Hardeman, a young man whom she had known for about three years, drove up in front of her house and called her out to the car and Hardeman asked her to go driving with him. This she refused to do and he introduced her to appellant and appellant asked her to go riding with him. She agreed to do this if he would ride down town and not in the country. In response to this suggestion he told her that he would do so and would put Nat Hardeman out in town. This was all the conversation that took place at her house, whereupon she got in the car on the front seat between Hardeman and the appellant. They went north until they reached Palestine Avenue, then they went east out Palestine Avenue, until they came to Link Street; Link Street leads to the Meadow Brook Country Club road as it goes north, in fact Meadow Brook Country Club road is an extension of Link Street. As they were going down North Jackson Street prosecutrix claimed that she told them that she thought they were going to town and Nat Hardeman said they weren't going to town and didn't intend to go to town, and that she told them to take her home, and they said they didn't intend to do that. She testifies that Nat Hardeman was doing the talking. She also testified that seeing they were not going to take her home she tried to get out of the car, and screamed and was on Palestine Avenue at the time she screamed, and that Walter Vinsen put his hand over her mouth, and that she got away from him out on the

end of Link Street and screamed again and then he put his hand over her mouth again and held it there until they got to the Country Club road. She screamed one time from the time they started on Link Street until they reached the place where they got out of the car. When they reached the place near the Country Club, Nat Hardeman stopped the car and said that prosecutrix had to get out, and Walter Vinsen pulled her out and Nat Hardeman pushed her. She says that appellant didn't say anything to her at the time he was pulling her out of the car. After she got out of the car Nat Hardeman drove on off down the road, and as he drove off he said that he would be back after a while. Prosecutrix testified that she knew the Locks lived close to the place where she was taken out of the car. She also testified that there was another house which the State's testimony shows was situated from about eighty feet to fifty yards from where she and the appellant got out of the car, and the State's testimony shows that the people living in this house were at home on the night this offense is alleged to have been committed. She further testified that after Hardeman had driven away, appellant said he wanted her to give him some, and she said she would not and he said she was, if he had to make her; and that she tried to get away and struggled all the way down to where the Locks live, and she got away from him and started to running past Lock's, and he caught her down at the end of the hill and she got loose from him again and ran up to Lock's. She testified that it must have been close to an hour that she tussled with the appellant there from the time they got out of the car until they got up near to the Lock place. She further testified that during the time they were scuffling the appellant did not say anything to her; describing the tussle between them she said:

"Well, he grabbed me by the wrist and tried to throw me down and tried to trip me with his feet, but he didn't succeed in doing that for quite a bit and then he did, he threw me down twice, but I had gotten up before he could get down, and the third time he threw me down he fell down on top of me, and I struggled and got away from him then. Yes sir, he put his hands on me. He put his hands on my legs, above my knees. At the time he threw me down the third time and fell down on top of me he had his trousers unbuttoned and had unfastened his belt also. When he threw me down, at the time he fell on top of me, he threw me on my back on the ground. His legs were on top of mine. My legs were flat on the ground. He propounded the question to me and asked me to give him

some a number of times.   Yes sir, I understood what he meant
by that.   I understood it to mean that he wanted to have sex-
ual intercourse with me.   The first person I met after I left
this place, and had gotten loose from Walter Vinsen, was Clyde
Lock.   I had traveled into the grounds of the Country Club.
No sir, I couldn't estimate how many yards that would be—I
couldn't estimate the distance.   Yes sir, I made known to Mr.
Lock what the trouble was.   He brought me home.   He brought
me in a car.   After the tussle with Walter Vinsen that I have
just described, my dress was torn off of my shoulders and torn
around the bottom of the dress.   Yes sir, I had some bruises
on my body.   There was bruise on my shoulders, and I think
he must have done it with his fist.   I remember slightly when
I received the bruise.   It was when we were struggling and he
was trying to hold me, and I wrenched away from him and his
fist hit me on my shoulder.   The defendant was not under the
influence of whiskey.   Yes sir, he had drunk some whiskey.
I know that he had been drinking some whiskey—I smelled it
on his breath. * * * I did not give the defendant my consent
to treat me as he did treat me.   I did not give him permission
to put his hands on my legs above my knees.   I did not give
him my consent to put his hands on me anywhere. * * * Yes
sir, there was a house located near the place.   No sir, the Lock
house was not the nearest house to the place where we were.
I don't know whose house it was, but it was right in front of
where we were.   Just across the road from where we were.   I
couldn't say just exactly how far because I don't know—it was
about as far as from here to the back of the court room.   Yes
sir, in going to the Lock house you pass directly by, or near
the other house that was closest to the place where this trouble
happened.   I was at the beginning of Link Street at the time
I screamed.   No sir, I did not make any effort to make an out-
cry after that before I was taken out of the car."

On cross examination, the prosecutrix testified as follows with
reference to the lick on her shoulder:

"I do not know whether that lick was on purpose or was an
accident; I can't tell which it was."

After further testifying on cross examination that Hardeman
came back by where he had left them about twenty minutes
after he had gone the first time and that she did not request
Hardeman to take her to town and in fact said nothing to Harde-
man when he came back where they were, she made the fol-
lowing statement:

"I came to town with Clyde Lock. No sir, I did not ring for the officers. Yes sir, we met some officers on the way to town. I don't know who they were. Mr. Lock said they were officers. I told Mr. Lock not to tell them about it that I would lose my position if it was found out. Yes sir, I told him I didn't want them to see me and didn't want them to know I was in the car. No sir, I didn't want any prosecution in this case at that time. I didn't want to lose my position, and I told him that I wanted it kept quiet."

The appellant urgently insists that the evidence is not sufficient to show an assault with intent to commit rape. The authorities in this State are one way to the effect that in order to convict the defendant on a charge of assault to commit rape, the evidence should not only show an assault but that the defendant intended to gratify his passion on the person of the woman, and that he intended to do so at all events, notwithstanding any resistance on her part. It has also been decided in a very able opinion by Judge Hurt that when the act of a person may reasonably be attributed to two or more motives, the one criminal and the other not, the humanity of our law will ascribe it to that which is not criminal. In the same case he says that it is neither charity nor common sense nor law to infer the worst intent which the facts will admit of, but the reverse is the rule of justice and law. If the facts will reasonably admit the inference of an intent which though immoral, is not criminal, we are bound to infer this intent. After stating the above rules in a case similar to this Judge Hurt said:

"These rules apply with the same force to a case involving the question as to whether there was an intent to gratify lust with or without force. The nature of the charge presupposes that the intent was not carried out. It is therefore necessary that the acts and conduct of the person should be shown to be such that there can be no reasonable doubt as to the criminal intent. If these acts and conduct are equivocal or equally consistent with the absence of the felonious intent charged in the indictment, then it is clear that they are insufficient to warrant a verdict of guilty. State v. Massay, 86 N. Carolina 658."

Applying these rules to the facts in this case, we think it cannot be said that appellant's conduct was inconsistent with an intent only to gratify his lust with prosecutrix's consent. It occurs to us that the testimony is entirely lacking to show that appellant intended to have intercourse with the prosecutrix at all events notwithstanding any resistance on her part. Considering the fact that the prosecutrix utterly fails to give any

reason other than appellant's own choice as to why he desisted from his enforced attentions, would it not be in harmony with justice, common sense and law to infer that he intended to have connection with her without force but with her consent rather than to presume from the facts stated that he intended to gratify his passion at all hazards and notwithstanding any resistance on her part. We think so, and as a basis for this conclusion we further quote from Judge Hurt:

"Why? Because every man is presumed to be innocent until the contrary is proved; and it is a well-established rule in criminal cases that, if there is any reasonable hypothesis upon which the circumstances are consistent with the innocence of the party accused, a verdict of acquittal should be rendered for the reason that the proof fails to sustain the charge. A party on trial is not presumed to be guilty because the facts are consistent with his guilt but they must be inconsistent with his innocence."

We think the testimony in this case wholly insufficient to show a present intention on the part of appellant to commit rape on the prosecutrix by the use of such force as was necessary to overcome resistance on her part. There is nothing in the record showing any fact or circumstance that caused the appellant to desist in his unwelcome attention toward prosecutrix except his own volition, and the force described by prosecutrix at the time he was attempting to fondle her is in our opinion wholly insufficient to show an intent to commit rape. O'Brien v. State, 40 S. W. 969; Stoker v. State, 225 S. W. 444; Dina v. State, 78 S. W. 229; Dockery v. State, 34 S. W. 281; Wood v. State, 61 S. W. 309; Caddell v. State, 70 S. W. 91; Coffee v. State, 76 S. W. 761; Warren v. State, 103 S. W. 888; Steinke v. State, 25 S. W. 287.

Because in our opinion the facts are insufficient to support the verdict the judgment is reversed and the cause remanded.

*Reversed and remanded.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.