## CLAY CAPE v. STATE.

No. A-9099.    April 2, 1937.
(66 Pac. [2d] 959.)

174

Mathers & Mathers and G. Gordon McBride, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Jess L. Pullen, Asst. Atty. Gen., for the State.

DOYLE, J. This appeal is from a judgment of conviction of the crime of "assault with intent to commit rape," rendered October 4, 1935, and sentence in accordance with the verdict of the jury of imprisonment in the county jail for a period of one year, and in default of the payment of the costs, further imprisonment in said county jail for a period not to exceed one day for every dollar of the costs.

The information in substance charged that in Oklahoma county on May 19, 1935, Clay Cape, the defendant, did then and there assault with intent to commit rape, one Helen Gilmore, a female, with the felonious intent to have sexual intercourse with her by force and violence sufficient to overcome any resistance she might make, she, the said Helen Gilmore, not being the wife of said defendant.

The only questions presented that require consideration arise upon the sufficiency of the evidence to sustain the verdict and judgment of conviction.

The evidence shows that at the time of the alleged commission of this offense the prosecutrix, 25 years of age, lived with another girl in an apartment, in the first block East Park, Oklahoma City. The defendant, 30 years of age, lived with his parents on a farm near the city and worked in the city as a mechanic; had lived in Oklahoma county from childhood. He was the owner of an automobile. Meeting his friend Jimmie Cathey in the city that Sunday afternoon, Cathey told him his friend Ruth Sanders had arranged a blind date for him with another girl. He told Cathey he had a date for that evening. Cathey insisted that they make the date that afternoon, and in defendant's car they drove to Miss Sanders' home. Cathey went in and returned with Miss Sanders. On the way to the apartment where the prosecutrix lived, it was suggested that they take some liquor along, and a pint of whisky was procured. Arriving at the apartment the defendant there for the first time met the prosecutrix. Remaining there about an hour, and drinking highballs, they left for a drive in the defendant's car, and visited Sprink Lake Park; after staying there about an hour they drove around the city, stopping

at Miss Sanders' home to enable her to get a coat, then continued to drive around the city. The defendant mentioned his other date for that evening, and they stopped and went into a drugstore; the defendant went to the telephone and they heard him call off his first date. About dark they were driving down Main street; Cathey told the defendant to stop the car, and he with Miss Sanders got out. The defendant then drove two or three blocks off Main street, stopped, left the car, and was gone about five minutes. When he came back he drove to Thirteenth and Robinson, there stopped at a drugstore and ordered, curb service, Coca-Cola and paper cups, then he drove north to Twenty-Third street, turned east about a mile, stopped at a filling station on a corner east of the Capitol, was gone about ten minutes and returned, drove on six or seven blocks, turned off on a side street a couple of blocks, and turned the car facing Twenty-Third street. It was then about 9 o'clock, and there the assault out of which this prosecution arises occurred.

The prosecutrix testified that her friend Ruth Sanders called her that afternoon and told her she had made a date for her, which she accepted. About 4 o'clock Miss Sanders and Jimmie Cathey, together with the defendant, called at her apartment; after staying there about an hour, during which time they drank whisky brought there by the men, and she had one drink, they then went riding, stopping at Springlake for about an hour; then they drove around through the city until it was dark; driving down Main street, Jimmie told the defendant to stop the car, and he with Miss Sanders got out; that she asked the defendant to take her home, and he refused and drove two or three blocks off Main street to a house, stopped, and went in and was gone about five minutes; he then drove north to Thirteenth and Robinson and there stopped

at a drugstore and ordered, curb service, Coca-Cola, and paper cups, and he had more than one drink there; then he drove north to Twenty-Third street, turned east about a mile, stopped at a filling station, went in, and was gone about ten minutes, then drove on six or seven blocks and turned off the street a couple of blocks, then turned back and stopped; that she protested against stopping the car, and he started making advances, tried to kiss her and told her his intentions were to have sexual intercourse; that she was trying to prevent what he was trying to do, and he struck her on the head near the left eye with his fist and he hit her more than once; that during the struggle, which was carried on for about 45 minutes, she managed to get hold of a car crank and hit him on the head with it and he stepped out of the car; then she got out on the other side, ran to the highway, and stopped a car driven by a man with two ladies; they took her to the University Hospital, where Dr. Robinson treated her eye; that she called her roommate; shortly afterwards Dr. Glomset called and took her to the Polyclinic Hospital, where she remained that night and the next day.

On cross-examination she stated that she was married to Dick Walker in 1928, and was divorced; that in July this year she remarried Mr. Walker; that she had a few highballs at her apartment before they came; that as a witness in the preliminary hearing she did not say anything relative to the defendant's clothing being open and did not testify that he put his hand under her dress; that she asked the doctor not to report the case; that the only complaint she made to the parties that picked her up was that her eye was hurt; that she told the parties that picked her up and told Dr. Robinson that her name was Helen Smith, and she told the officers the next morning that her pocketbook and her watch were gone.

Jimmie Cathey testified that the date was made so they could drive around in the defendant's car; that on the way to Miss Gilmore's apartment he gave the defendant the money to get some whisky; while there the two girls and the defendant went into the kitchen to drink the whisky; that Miss Gilmore asked him if he wanted a drink and he told her no; that before he left the car there was a dispute about getting more liquor, and after leaving the car with Miss Sanders he did not see the defendant again until about 2 o'clock that same night, when he came to his hotel and had a pocketbook, a shoe, and a hat, and they drove to Miss Gilmore's apartment; that at that time the defendant had blood on his face; that he went into the apartment; Miss Gilmore was not there, and when he came back he told the defendant that he was going to stay there awhile and asked him for and was given taxi fare to return.

Ruth Sanders testified that she arranged the date to go car riding; that she was in the car with Jimmie when he handed Mr. Cape some money and told him to buy some liquor; that the liquor was served in the kitchen of Miss Gilmore's apartment, but witness did not drink any.

Cross-examined, she stated that she had seen Miss Gilmore slightly under the influence of liquor; that when she left the car with Mr. Cathey, Miss Gilmore went off with the defendant of her own free will.

Dr. John L. Glomset testified that he first saw the prosecutrix at University Hospital around 11 o'clock that night, and took her to the Polyclinic Hospital; found bruises and swelling on the left side of the face, mostly around the eye, bruises over the shoulders and both legs.

Miss Oliver testified that she was in the car when they stopped and picked up the prosecutrix on N. E. Twenty-Third street, and when she got in the car witness smelled whisky on her breath; that she talked kind of funny, and witness thought she was drunk; she was complaining of her eye and said she wanted a doctor, and they took her to the University Hospital; she said she had a fight with a man.

Miss Carpenter testified that she was in the car when they picked up the prosecutrix; that she was complaining of her eye when she got in the car and said something about her purse having been taken and they took her to the hospital; she said she had a fight with a man. Witness asked the prosecutrix if the man tried to get smart with her, and she said: "No, he was awful nice to me; just look at my eye." That when they took her to the hospital she told the doctor not to report this.

James Duffey testified that he was driving in on N. E. Twenty-Third street with two girl friends and picked up the prosecutrix, and when she got into the car there was a trace of whisky on her, and she had a black eye; that he drove to the University Hospital and the girls took her in; that he noticed her skirt had a rip on the side.

When the state rested the defendant demurred to the evidence and moved for a directed verdict of not guilty on the ground that the same was insufficient to sustain a conviction. Overruled. Exceptions.

On the part of the defense, Dr. M. E. Robinson testified that he was surgeon in pathology at the University Hospital; that he treated a lady's eye that came to the hospital and has since learned that her name was Helen Gilmore; that the name she gave that night was Helen Smith; that she had a bruised eye that was swelling, and

he noticed she had a bruised place on her head; she said she wanted the eye fixed up so she could go to work in the morning; that he asked her how she got the black eye, and she said she had been in a fight with someone and got hit; that both of them had used an automobile crank; she said she was hit with the crank, but that she used the crank first; that he knew that she had been drinking and there was evidence of intoxication; that in their conversation she did not make any statement relative to a man attempting to rape her.

The defendant as a witness in his own behalf testified that he met Jimmie Cathey about 2 o'clock Sunday afternoon, who said he had a date with Ruth Sanders and proposed to get a lady friend for him. He told him it would hardly be worth while because he had a date at 7:30. Cathey kept insisting, so he said they would ride around awhile, and they drove to Miss Sanders' home. Jimmie went in and came back with Miss Sanders. She told him she had a lady friend she wanted him to meet, and he consented. Miss Sanders got in the car and on the way suggested they should get something to drink. Jimmie gave him the money and they stopped at a place and he got a pint of whisky. While at the apartment they went into the kitchen and Miss Gilmore made highballs with the whisky. All except Jimmie drank the highballs. After visiting there about an hour, the girls suggested a drive, and as they were ready to leave Miss Gilmore said, "I believe there is some more whisky in there, let's drink what is left before we go," and he and the women drank what was left. They then drove to Spring Lake, where Jimmie played baseball; after staying there about 30 minutes they started back, stopped at a drugstore, and Jimmie and Miss Sanders got out and went in. Miss Gilmore suggested that he break his other date, and they went in

and he called the lady he had the date with and told her he would not be able to see her that night. After driving around for about an hour, the girls wanted to get some more liquor. Jimmie said, "I rather you girls would not have any more to drink," and there was an argument while they were driving down Main street, and Jimmie said, "Stop the car," and said to Ruth Sanders, "I am taking you out of this car," and they left the car. As they drove on, Miss Gilmore asked him to buy her some whisky before taking her home, so he drove to another place, and leaving her in the car went and got a pint of whisky, then drove north to Thirteenth and Robinson and there ordered Coca-Cola and paper cups, and they had a couple of drinks of whisky with the Coca-Cola. A police car came by and they drove on, turned east on Twenty-Third street, and he stopped at a filling station, got out of the car and went to a rest room; was gone between five and ten minutes. When he came back she was taking another drink, and he said, "You are going to get tight if you don't quit drinking like that." She said: "Who in the hell cares, we are going to get drunk, are we not?" He said, "No, we are not going to get drunk and get in jail, don't do that." He drove on six or seven blocks and turned north, then back and parked the car. She took another drink and he begged her not to get drunk. She kept insisting on drinking, and he took the bottle from her and refused to let her have another drink. She got sore and called him a poor sport and called him all kind of names, and they got into a scuffle over the whisky bottle, and he again took it away from her. Then the first thing he knew she hit him on the side of the head with a car crank. It made him half crazy and he slapped her back a few times. Finally he came to himself and she came to her senses and said she was sorry that she hit

him with the crank, then said, "Let's have another drink and forget about it," and they each took another drink. It was then about 10 o'clock. In a few minutes she wanted another, and he said, "No, we are not going to drink any more." She got out of the car, pulled off her shoe, turned back and hit him with it, and ran away. That he sat there a few minutes; when she did not come back, he got uneasy and got out of the car and looked around for her; then got in the car, circled several blocks looking for her, but did not see her any more that night; that he did not attempt by force and against her will to have sexual intercourse with her, did not make any threats, and did not put his hand under her dress. That he drove back to Jimmie's; he was not at home, and he waited for him until between 1 and 2 o'clock. When Jimmie came he took him in the car and drove to Miss Gilmore's apartment. Jimmie went in and there was nobody there. They drove around and went back the second time, and Jimmie went in, was gone four or five minutes, and came out and said he was going to stay awhile, and asked him for taxi fare, which he gave him. That he did not know Miss Gilmore was in the hospital until after she was released the next day. That he went that night to her apartment with Jimmie to return her purse and things she left in the car.

It is contended that the evidence is not sufficient to show a felonious assault with intent to commit rape, and that it lacks the corroboration of the prosecutrix required in prosecutions for rape and kindred offenses.

"Rape," as defined by our statutes (Penal Code, § 2515 [21 Okla. St. Ann. § 1111]), is an act of sexual intercourse accomplished with a female, not the wife of the perpetrator, under either of the following circumstances, reciting eight conditions under which an act of intercourse

will constitute rape, if accomplished. The facts in this case restrict us to the consideration of the question whether the defendant assaulted the prosecutrix with intent to commit the offense of "rape" as defined by the fourth subdivision of the section above, namely, "Where she resists but her resistance is overcome by force and violence."

An "assault" is any willful and unlawful attempt or offer, with force or violence, to do a corporal hurt to another (Penal Code, § 1865 [21 Okla. St. Ann. § 641]), and a "battery" is any willful and unlawful use of force and violence upon the person of another (Penal Code, § 1866 [21 Okla. St. Ann. § 642]).

An assault with intent to rape includes every element of the crime of rape by force overcoming resistance except penetration. The felonious intent is the essence of the offense. It is elementary, when a specific intent is required to make an act an offense, that the doing of the act does not raise a presumption that it was done with the specific intent. Intent, which is essential to support conviction of assault with intent to rape, cannot be presumed, but must be shown to exist by competent evidence and beyond a reasonable doubt. Something more than a mere intention and solicitation is necessary.

It is therefore necessary that the acts and conduct of the defendant should be shown to be such that there can be no reasonable doubt as to the felonious intent. If these acts and conduct are equally consistent with the absence of the felonious intent, then it is clear they are insufficient to justify or sustain a verdict of guilty.

In order to convict on a charge of assault with intent to commit rape by force upon a woman over the age of consent, the evidence should not only show an assault, but that the defendant assaulted the prosecutrix with the

intention of gratifying his passion on her person at all events, notwithstanding any resistance she might make. Rose v. State, 32 Okla. Cr. 294, 240 Pac. 754; Brockman v. State, 60 Okla. Cr. 75, 61 Pac. (2d) 273; Vinsen v. State, 102 Tex. Cr. R. 235, 277 S. W. 644.

In the case of People v. Cieslak, 319 Ill. 221, 149 N. E. 815, 816, it is said:

"The proof of a mere assault and battery, however aggravated it may be, without the intent to rape, will not warrant a conviction of assault with intent to rape, nor will the proof of mere licentious conduct, or even violent familiarity, with the female in an effort to induce her to yield to the embraces of the assailant, where there is no proof that he intended to have carnal knowledge of her by force and against her will. The specific intent charged is the gist of the offense."

In Witt v. State, 29 Okla. Cr. 357, 233 Pac. 788, 789, it is said:

"The charge is one that arouses the passions and prejudices of jurors, and for that reason it is the duty of the court to closely scrutinize the evidence, and where the evidence of the state is unreasonable, inconsistent, and contradictory, and there is inherent evidence of improbability or indications that the prosecution is maliciously inspired, the court should not permit a conviction to stand."

In Ferbrache v. State, 21 Okla. Cr. 256, 206 Pac. 617, this court held:

"Under the laws of this state, conviction for rape may be had on the uncorroborated testimony of the prosecutrix; but when her testimony is contradictory, and the defendant testifies and denies specifically the testimony of the prosecutrix, and his testimony is corroborated, the testimony of the prosecutrix, standing alone, is not sufficient to warrant a conviction."

This court does not hold with some that, as a matter of law, rape or assault with intent to rape cannot be established by the uncorroborated testimony of the prosecutrix, but in common with all courts recognizes that, without such corroboration, her testimony must be clear and convincing; and while there is no rule of law which forbids a jury to convict on the uncorroborated testimony of the prosecutrix, provided they are satisfied beyond a reasonable doubt of the truth of her testimony, yet the courts have always recognized the danger of conviction on her uncorroborated testimony, and her testimony, if inherently improbable and uncorroborated, will not justify or support a conviction; as the only reasonable conclusion in such cases is that such verdicts are the result of passion or prejudice, and therefore contrary to law. Dawes v. State, 34 Okla. Cr. 225, 246 Pac. 482, Davidson v. State, 57 Okla. Cr. 188, 46 Pac. (2d) 572.

The rule in such cases is that corroborating testimony should tend to show the material facts necessary to establish the commission of the crime. It is not indispensable that such corroboration should be furnished by positive and direct evidence, but proof of circumstances legitimately tending to show the existence of the material facts will be sufficient to authorize a conviction.

An examination of the proof in this case fails to disclose any evidence corroborating the testimony of the prosecutrix, excepting her physical condition immediately after the alleged assault, which showed an assault and battery. Her testimony is contradictory and bears upon its face evidence of unreliability, and for this reason we think there was needed corroboration that her condition was the result of force and violence on the part of the defendant in attempting to overcome her resistance to an assault with intent to commit rape.

The controverted questions were: Which was the aggressor, and with what intent was the assault and battery committed? The conduct of these parties must be considered in connection with the fact that they both were excited by intoxicating liquor. The testimony of the prosecutrix, when applied to the admitted facts in this case, is of a very doubtful character. She testified that the defendant made improper advances and told her his intention was to have sexual intercourse; that she was trying to prevent him, and he hit her with his fist on the head and hit her more than once; that during the struggle, which lasted about 45 minutes, she picked up a car crank and hit him on the head with it. She did not deny that she told Dr. Robinson that she was hit with a car crank, but that she used the crank first, and that she told the doctor not to report the case.

It is admitted that she made no complaint and told no one that night that the defendant had attempted to rape her.

The proper practice is that on the direct examination of the prosecutrix she may be asked if she made complaint that such an assault had been made upon her, and when, and to whom, but not as to the particular facts which she stated.

It has been held that a woman's complaint at the earliest opportunity is a corroborating circumstance, tending to sustain the truth of her statement on the stand. It has also been held that, when the prosecutrix fails to make complaint within a short time after the alleged rape or assault with intent to rape, her uncorroborated testimony is not sufficient to sustain a conviction. 2 Wigmore, Ev. pars. 1134-1140, and cases cited; Witt v. State, supra; Rose v. State, 32 Okla. Cr. 294, 240 Pac. 754.

The statutory age under which the consent of the female does not deprive the act of sexual intercourse of its criminal effect is fixed at 16 years and at 18 where the female is of previous chaste and virtuous character, but over that age, where the parties are single and the female is capable of giving legal consent, our Penal Code does not make such intercourse a crime, if accomplished by the free will and consent of the female.

The defendant had never been charged with any crime, either felony or misdemeanor, and so far as the record shows had been a citizen of good repute. It appears he was 30 years old, six feet tall, and weighed 170 pounds. He admitted that he slapped the prosecutrix after she hit him with the car crank. If a blow is given in self-defense, it is justifiable and it is not unlawful, and it does not have the character of and is not an assault.

Taking the evidence relied upon by the state to be true, we think that it was insufficient to show felonious intent to overcome any resistance she might make.

The state, in its brief, has given us no citations of authority to sustain its contention as to the sufficiency of the evidence to sustain a conviction.

The defendant in this case is entitled to the same presumption of innocence which prevails in other cases, and we are constrained to say that evidence has not been given here rebutting that presumption. We think the evidence was insufficient in the absence of the proper proof to show felonious intent.

For the reasons stated, we are of opinion that the evidence in this case is insufficient to support the verdict.

The judgment is therefore reversed.

DAVENPORT, P. J, and BAREFOOT, J., concur.