Clyde NUBINE, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. A–15938.

Court of Criminal Appeals of Oklahoma.

Feb. 6, 1973.

Rehearing Denied March 5, 1973.

Dan A. Erwin, Chandler, for appellant.

Larry Derryberry, Atty. Gen., Paul Ferguson, Asst. Atty. Gen., John L. Clifton, Dist. Atty., Jerry Lathrop, Asst. Dist. Atty., for appellee.

## OPINION

BUSSEY, Judge.

Appellant, Clyde Nubine, hereinafter referred to as defendant, was charged, tried and convicted in the District Court of Lincoln County for the offense of Assault With Intent to Rape, After Former Conviction of a Felony; his punishment was

fixed at a term of not less than three (3) years nor more than ten (10) years imprisonment, and from said judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, Theron Hill testified that on May 31, 1969 at approximately 5:00 a. m., he was driving through Prague on Highway 62 when a young Negro male whistled at him and asked for a ride to Oklahoma City. The young man stated that he had been in Boley and that a friend of his had left without him. Hill replied that he would give him a ride but that he would have to search him first. As he was searching the young man, a police car arrived at their location. He talked to the police for several minutes and heard a description come over the radio in the police car which fit the description of the young man. The police asked the young man to go with them and he jumped into the ditch and picked up a rock stating that he hadn't done anything and that he had to go home. The police continued to ask him to get in the car and he started walking up the highway with the police following him.

John Williams testified that he parked his red 1957 Chevrolet in Boley at approximately 2:30 a. m. At approximately 4:00 a. m. he discovered that his car was missing. He next observed the car approximately two days later in Prague. The crank shaft of the car was "kind of messed up a little" and it caused the car to run hot.

Meddie Hinds testified that she was seventy-three (73) years old and lived at the Hinds Motel in Prague. At approximately 4:00 a. m. on the morning in question, someone rang the bell on the office door. A person, whom she identified in court as the defendant, stated that he wanted to use the telephone. She told him that it was out of order. The defendant then stated that the "bunch" had gone off and left him and he needed to have some water for his car. She gave the defendant an "old stew pan" and told him where the outside water faucet was located. The defendant made several trips carrying water and then rang the door bell again. She unlatched the screen and the defendant yanked her outside stating that if she made a sound he would kill her. She screamed and the defendant struck her with the pan and his fist. The defendant knocked her to the ground and pulled her dress up and felt of "my privates and all over my body." He removed his private parts and attempted to penetrate her unsuccessfully. A car came by and the defendant forced her to go up to the station to a car. He ordered her to get in the car whereupon he "yanked up my dress and started to molest me, again." (Tr. 49) A police car drove up and the defendant jumped out of the car and ran around the station. The police officer took her to the hospital.

On cross-examination, she testified that she was "pretty sure" that she saw the defendant at the hospital but "I couldn't swear to it."

Officer Russell testified that in the early morning hours of May 31, he received a report from a newspaper girl and proceeded to the east part of Prague. He observed a car in the Gulf Station which had not been there when he last passed the location approximately twenty minutes before. He stopped his vehicle approximately eight to ten feet from the other vehicle and heard a woman scream. A man, whom he identified in court as the defendant, got out of the car and ran behind the station. The officer ran after the defendant but lost him. He returned to the car and observed Meddie Hinds bleeding from the head. He took Mrs. Hinds to the hospital then called the Chief of Police, giving him a description of the person that he had seen with Mrs. Hinds. He next observed the defendant fifteen minutes later at a location approximately seven blocks from the scene. He identified State's Exhibit 5 as the shirt that the defendant was wearing. The defendant was at another car with another couple in it. He identified the defendant to the chief of police and the de-

fendant was advised that he was under arrest. The defendant stated that he was not going to be arrested and picked up a rock. The defendant started "backing up" and walked approximately a quarter of a mile with the officers following him. He was finally subdued after approximately forty minutes.

Dianna Kinsey testified that she was delivering papers in the early morning hours of the day in question. At approximately 4:00, a young colored male attempted to stop her. She drove on around the block and observed him approximately five minutes later in front of the Hinds Motel. She identified State's Exhibit 5 as a shirt being of the same color that the person she observed was wearing. She stopped a police car and informed the officer what she had seen.

James Barnard testified that he was employed as the chief of police of Prague. He received a telephone call from Officer Russell on the morning of May 31 and, as a result of the call, started to proceed to the scene. En route, he observed a car parked on the north shoulder of Highway 62. He had a conversation with the man in the car and ascertained that the defendant had stopped the car wanting a ride to Oklahoma City. He went back to his police unit and radioed Officer Russell requesting more identification on the subject he had observed. Upon receiving the description, he advised the defendant that there had been a woman beaten and that he was under arrest. The defendant stated that he "didn't beat no god-damned woman up—that he wasn't going to jail for something that he didn't do." (Tr. 96) The defendant ran for approximately fifty yards and picked up a rock. He and Officer Russell, who had arrived at the scene, followed the defendant and tried to talk him into surrendering. Defendant started running west again along Highway 62. When Melvin Sires, the investigator for the District Attorney's office, arrived the chief went to Prague Hospital and talked to Mrs. Hinds. He returned to the scene and the defendant was physically taken into custody. The defendant was taken to the Prague Hospital and then to the Lincoln County Jail.

Melvin Sires testified that he received a call for assistance from Chief Barnard on the morning in question. He proceeded to the location and assisted the other officers in physically apprehending the defendant.

Dr. Mosley testified that he treated Mrs. Hinds on the morning in question. She had a cut on her scalp which required five stitches, a bloody nose and multiple bruises about the face and arms.

On cross-examination, he testified that Mrs. Hinds' eyesight is bad.

John McAuliff, a chemist with the Oklahoma State Bureau of Investigation, testified that he received a terry cloth seat cover from Melvin Sires. He conducted tests on the stains on the seat cover and was of the opinion that they were blood of human origin.

Melvin Sires was recalled and identified the terry cloth seat cover as the one he removed from the 1957 Chevrolet.

For the defense, the defendant testified that he was eighteen years old and lived in Oklahoma City. On the day in question, he went to Boley with a friend of his and attended a rodeo and, later that evening, a dance. He missed his ride back to Oklahoma City and started walking down Highway 62. He hitched a ride with a young Negro male driving a maroon 1957 Chevrolet. The car started to run hot and when they got to Prague, they stopped at the Gulf Service Station to get some water. Upon ascertaining that the water did not work at the station, the driver told him to look around and see if he could find some place to get water. He then stopped Theron Hill and asked him if he would give him and his partner a ride to Oklahoma City. As he was talking to Hill, Chief Barnard arrived. He testified that he resisted arrest because he had not done anything and that he did not want his probation officer to know that he had left Oklahoma City without permission. He

denied attacking Mrs. Hinds and asked the officers to look for "this other guy." (Tr. 145)

■■ The first proposition asserts that the defendant was denied by reason of his financial circumstances, an adequate preparation of his case for trial. Defendant was first tried on October 7, 1969, which trial resulted in a hung jury. Thereafter, on December 11, 1969, the defendant filed an application requesting that the State bear the expense of a transcript of his first trial. This application was overruled by the trial court. Although this proposition is improperly before this Court in that the defendant did not cite authorities to support his allegation of error, we observe that defendant has failed to show how he was prejudiced by the lack of the transcript of the first trial. The record reflects that the defendant was furnished a copy of the preliminary hearing transcript at State expense. The record further reflects that the defendant had a transcript of Mrs. Hinds' testimony given at the first jury trial and a transcript of Melvin Sires' testimony given at a hearing on a petition for a writ of habeas corpus, which he used to attempt to impeach the witnesses.

■■ The second proposition contends that "the court erred in failing to declare a mistrial upon the opening statement of the District Attorney, which contained statements calculated to prejudice the jury in favor of the State and against the defendant." The defendant argues that the rights of the defendant were seriously impaired by the District Attorney's reference in his opening statement to a stolen car, the beating of the victim with the pan, and the defendant's acts in resisting arrest. We have previously held that an opening statement is, and purports to be, no more than an outline of the State's theory and the evidence expected to be offered in support. The statement of incompetent or immaterial matter affords no ground for reversal unless it appears that the statement was manifestly prejudicial. Woods v. State, Okl.Cr., 440 P.2d 994.

■ Defendant next asserts that he was prejudiced by the introduction into evidence of testimony pertaining to the other crimes not constituting a part of the *res gestae*. Defendant argues that the testimony concerning the stolen car and the defendant's use of a rock in resisting arrest was improperly admitted. We are of the opinion that the testimony was admissible. John Williams testified that his car had been taken from the main street in Boley, which is located a short distance east of Prague, between 2:30 and 4:00 a. m. on the morning in question. Mrs. Hinds testified that the defendant came to the office door at approximately 4:00 a. m. and subsequently forced her to get into the automobile where the assault continued. In People v. Marose, 10 Ill.2d 340, 139 N.E.2d 735, in which evidence adduced that the car in which a forcible assault occurred was stolen, the Illinois Supreme Court stated:

"The facts concerning the stolen car and other sexual acts are all a part of the continuing narrative which concern the circumstances attending the entire transaction and they do not concern separate, distinct and disconnected crimes. * * *"

In Quinn v. State, 52 Okl.Cr. 81, 2 P.2d 970, the Court stated:

" * * * Evidence of resistance to arrest, flight, escape or attempt to escape, is generally, held admissible as showing a consciousness of guilt. The presumption arising from such conduct may be rebutted, and it is for the jury to say whether or not the conduct is due to a consciousness of guilt. * * *"

■ Defendant first asserts under this proposition that the court did not instruct the jury as to the purpose of admitting the evidence of other offenses. We need only observe that the defendant did not request such instruction and therefore, failure of the trial court to so instruct does not constitute reversible error. See Fields v. State, Okl.Cr., 364 P.2d 723.

■ The fourth proposition asserts that the trial court erred in denying his application for a continuance for the purpose of obtaining the attendance of the complaining witness for further impeachment. The record reflects that at the conclusion of Mrs. Hinds' testimony, the court stated: "You may step down—but you are not excused as you might be recalled." (Tr. 65) The record further reflects that the following day the defendant requested a continuance when the witness did not appear. The trial court inquired of the defendant the purpose for which he sought her attendance, to which the attorney for defendant stated:

"I want to call her for the purpose to show she has changed her testimony from the previous hearings and testified previously that she did bleed profusely down her face and onto her collar, and she has now denied that fact."

The trial court, in denying defendant's motion, stated:

"That type testimony would be for further cross-examination and counsel had a chance to call her before the State rested. It appears from the record that defendant has not subpoenaed her as a witness on behalf of the defendant and the Court does not deem at this time it would be proper to continue or delay the case to have the witness back here for further cross-examination. The request is denied." (Tr. 157)

We have consistently held that a motion for continuance is addressed to the sound discretion of the trial court whose denial of such motion will not be disturbed on appeal unless there is a clear showing of an abuse of discretion. Lewis v. State, Okl. Cr., 462 P.2d 336. We are of the opinion that the trial court did not abuse its discretion in denying defendant's motion for continuance. Defendant had the opportunity to cross-examine the witness and had access to transcripts of her testimony given at both the preliminary hearing and the first trial. Defendant stated his reason for recalling her was for the purpose of further impeachment as to the amount of blood on her face. Under said circumstances, we conclude that the trial court properly denied defendant's motion for continuance.

■ The fifth proposition contends that "in the absence of intelligent waiver of his rights, defendant was deprived of his constitutional rights under the Sixth Amendment of the Constitution of the United States by his exhibition before the complaining witness without counsel." The record reflects that within minutes after the defendant was apprehended, the arresting officers took him by the Prague Hospital to confirm the victim's identification. Defendant cites as authority United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, wherein the United States Supreme Court held that the presence of counsel has been necessary at "lineups, show-ups or identification parades." The Attorney General succinctly points out in his brief that "the Federal Appellate Courts in analogous situations have distinguished between an on-the-scene identification and the formal lineup held after indictment as in the *Wade* case, supra." The landmark decision for the *in-the-field-confrontation* is Russell v. United States, 408 F.2d 1280 (1969 cert. den., 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245) wherein the Court stated:

"While the language of *Wade* would thus seem to encompass prompt on-the-scene identifications, they do not fall within the holdings of *Wade* or its companion case, Gilbert v. California. The confrontations disapproved in these cases were post-indictment lineups. Similarly, though it spoke in broad terms, the Court was evidently focusing primarily on the routine line-up and show-up procedures employed by the police to obtain evidence for use at trial. The Court was concerned both to enhance the fairness

of such procedures and to expose to judge and jury any elements of unfairness or unreliability which might attend them. In these typical cases, where counsel had been retained and time was not a factor it could find 'no substantial countervailing policy considerations * * * against the requirement of the presence of counsel.'

"The present case, however, involves an immediate on-the-scene confrontation at 5 o'clock in the morning when there would necessarily be a long delay in summoning appellant's counsel, or a substitute counsel, to observe a formal lineup. Such delay may not only cause the detention of an innocent suspect; it may also diminish the reliability of any identification obtained, thus defeating a principal purpose of the counsel requirement." (All footnotes omitted)

In Bates v. United States, 132 U.S.App. D.C. 36, 405 F.2d 1104, wherein two women were assaulted and the suspect was arrested in the vicinity and brought before them approximately thirty minutes later without counsel, the Court speaking through the present Chief Justice of the Supreme Court stated:

"* * * [T]he police action in returning the suspect to the vicinity of the crime for immediate identification in circumstances such as these fosters the desirable objectives of fresh, accurate identification which in some instances may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is fresh. * * * "

The Supreme Court of Kansas in State v. Meeks, 205 Kan. 261, 469 P.2d 302, cited the *Russell* and *Bates* decision, *supra,* with approval. In State v. Meeks, *supra,* where there was an on-the-scene identification of the only suspect within four hours after the offense was committed, the Court stated:

"* * * [T]he time between the crime and the arrest was short; the finger of suspicion pointed to the appellant, but he denied the crime. He may or may not have been the robber. The only eye witness who could identify the appellant for sure was the victim, and time was important. Any delay in identifying the appellant would mean that, had he not been the robber, the real culprit would be at large with the trail growing cold while the appellant remained in custody. Under the circumstances we find the on-the-scene identification of the appellant did not infringe the constitutional counsel requirement."

■ The final proposition contends that the evidence is insufficient to sustain the verdict of guilty to the crime of Assault With Intent to Rape. We are of the opinion that this proposition is likewise without merit. In Cape v. State, 61 Okl.Cr. 173, 66 P.2d 959 (1937), the Court stated in the third paragraph of the Syllabus:

"In order to convict a defendant of an assault with intent to commit rape upon a woman over the age of consent, the state must establish by the evidence, to the satisfaction of the jury, and beyond a reasonable doubt, that the defendant intended to have sexual intercourse with the female by force and against her will, and that he not only used force, but used such force with the intention of gratifying his passion on her person at all events, notwithstanding any resistance she might make."

We conclude that the evidence of Mrs. Hinds was suffficient to support the verdict of guilty of the crime charged. The judgment and sentence is, accordingly, affirmed.

BLISS, P. J., and BRETT, J., concur.