## JOHN C. ALLEN v. STATE.

No. A1594. Opinion Filed July 22, 1913.

(134 Pac. 91.)

1. RAPE—Evidence—Specific Acts. On a trial for statutory rape, evidence of specific acts of unchastity on the part of the prosecutrix with others than the defendant is inadmissible, unless shown to be a part of res gestae, and it was prejudicial error to permit the prosecutrix to testify as to her acts of unchastity with others than the defendant, and not connected with the act charged in the information.

2. SAME—Necessity of Corroboration. While, as a matter of law, corroboration of the prosecutrix's testimony as to the fact of sexual intercourse is not essential to a conviction, yet where this issue of fact is controverted, and the testimony of the prose-

cutrix bears upon its face inherent evidence of improbability, there must be corroboration by other evidence connecting the defendant with the commission of the crime; especially must this rule be held applicable in a case where the prosecutrix has been successfully impeached.

3.    **APPEAL—Harmless Error.** Incompetent, irrelevant, and immaterial evidence, which tends to excite the passions, arouse the prejudices, and awaken the sympathies, or warp or influence the judgment of jurors, cannot be considered as harmless.

4.    **RAPE—Sufficiency of Evidence.** See opinion for evidence held insufficient to support the verdict and judgment.

*Appeal from District Court, Pontotoc County;*
*Tom D. McKeown, Judge.*

John C. Allen was convicted of crime, and appeals. Reversed.

*Stone & Maxey* and *Lieuallen & Shulte,* for plaintiff in error.

*Chas. West,* Atty. Gen., *Smith C. Matson,* Asst. Atty. Gen., and *Monroe Osborn,* for the State.

DOYLE, J. John C. Allen was convicted in the district court of Pontotoc county of the crime of rape alleged in the information to have been committed on one Era Allen, a female under the age of sixteen years, on or about November 1, 1910, and his punishment was assessed by the jury. On July 31, 1911, he was sentenced to the penitentiary for a term of five years. The conviction rests solely upon the uncorroborated testimony of the daughter of the defendant, the female with whom the incestuous intercourse is alleged to have been committed. In the view we take of the record and the duty devolving upon this court as to the disposition to be made of the case, it is unnecessary, and would perhaps be profitless, to discuss and determine the questions arising upon the rulings of the court in relation to matters occurring preliminary to the trial upon the merits. The principal contention is that the evidence was insufficient to justify the verdict, and that errors were committed upon the trial, in admitting incompetent and rejecting competent testimony, which require that this court should reverse the judgment.

To a correct understanding of the case so far as it involves the sufficiency of the evidence to sustain the verdict, a summary

of the prosecutrix's testimony is given, together with a transcript of the most material parts.

She testified that she was about fifteen years of age, and was the daughter of the defendant; that during the year 1910, until in some time in October, she lived at home on her father's farm near Ahloso; that her father's family consisted of herself, one sister, and three brothers; that one brother was twelve, another ten, and the other six, and her sister was nine years of age; that old Dick Townsend, a negro, stayed with the family. She then testified as follows:

"Q. Era, did ever anything wrong take place between you and old Dick. (The defendant's objection overruled, and exception.) A. Yes, sir. Q. Did ever anything wrong take place between you and your father? A. Yes, sir. Q. When was that? A. A few weeks before I went to Coffeyville, Kan. Q. Tell the jury what took place, what your father said to you. A. He said it wouldn't hurt, being as I was already that way. Q. Did your father know your condition then? A. Yes, sir. Q. Were you in the family way at that time? A. Yes, sir; I was up before the grand jury the week before that. Q. Who come with you? A. Papa. Q. Did your father know who had done this to you? A. I don't know. Q. How did you happen to go to Coffeyville? Who suggested that you go up there? A. Papa and old Dick. Q. Who brought you to town? A. My oldest brother. Q. Did you have any money? A. Yes, sir. Q. Who gave it to you? A. Papa gave me some of it. Q. Where did you get the balance? A. From old Dick. Q. Who went with you? A. Old Dick went in the head car. Q. Who did you put up with there? A. A nigger family. Q. Who put you there? A. Old Dick. Q. How long had you been up there before you saw your father? A. Nearly two months. Q. How long did your father stay up there? A. He come one day and went home the next. Q. Was your baby born while he was there? A. Yes, sir. Q. Who was there when it was born? Mr. Stone: Objected to as incompetent, irrelevant, and immaterial. By the Court: Overruled. A. Papa and the nigger family was there, and the doctor. Q. What doctor? A. Dr. Whitecombe. Q. What kind of a doctor was he? Mr. Stone: Objected to as incompetent, irrelevant, and immaterial. By the Court: Overruled. Mr. Stone: We except.

"Q. Was he a white man or a nigger? A. He was a nigger. Q. Did you know where old Dick was at that time? A. No, sir. Q. Did you know a Mrs. Williams at Coffeyville? A.

Yes, sir.  Q. You talked to her, and she talked to you about your trouble?  A. Yes, sir.  Q. I will get you to state to the jury if you did not lay your trouble on other people.  Didn't you tell Mrs. Williams that it was other people than your father and old Dick who caused your downfall?  Didn't you tell Mrs. Williams it was somebody else?  A. At the start I did.  Q. You told the grand jury it was somebody else, didn't you?  A. Yes, sir.  Q. Did you know Dr. Fortner at Coffeyville?  A. Yes, sir.  Q. You also at first told him about what you told Mrs. Williams, didn't you?  A. Yes, sir.  Q. Who moved you from there?  A. My uncle, George Thompson, and George Moran.  Q. Era, do you know what date your child was born?  A. The 8th day of December."

On cross-examination she stated that in April, 1910, she became in the family way, and the negro Dick Townsend was the father of her baby; that another negro, Oscar Sims, worked there two or three weeks chopping cotton, and had intercourse with her five or six times; that at these times her father was away from home; that she had never told her father that she had been having intercouse with Dick Townsend and Oscar Sims; that at the time she left for Coffeyville, she had never told any person who was the father of the child; that when she returned from Coffeyville she stayed a few days at Mr. Lumpkin's, and about two months at Mr. Evans', and went from there to her Grandpa Moran's; that she had not been permitted to talk to any of her relatives, except George Moran and George Thompson; that the first person she told that her father had intercourse with her was Mrs. Williams, when she came down from Coffeyville and got the baby to carry it back to Kansas; that this was in February when she was at Mrs. Evans', and no other person was present at the time.  She admitted that on the defendant's preliminary trial her testimony was that her father had intercourse with her about a week after Dick Townsend first had intercourse with her; that her father and her uncle George Thompson were on bad terms, and that her father and her stepmother had trouble and separated in January, 1910; that her stepmother's brother, Jeff Mills, was frequently at their home while her stepmother was there.

As a part of her cross-examination witness was asked the following questions and made thereto the following answers:

"Q. All right, I will ask you if on or about the 27th of December, 1910, at the home of Mrs. Williams in Coffeyville, Kan., you made this statement, or in substance this statement, to Mrs. Williams: That your father, John C. Allen, had nothing to do with and that he did not know of your wrong acts; that your father, John C. Allen, was innocent of having had any illicit intercourse with you? Did you make that statement? A. Yes, sir. Q. I will ask you to state if on or about the 27th of December, 1910, at the home of Mrs. Williams in Coffeyville, Kan., you made this statement, or in substance this statement, to Dr. Fortner: That the first time you ever did wrong was when you had intercourse with Jeff Mills, and that your stepmother made you submit to him? A. Yes, sir. Q. Who was Jeff Mills? A. Her brother. Q. I will ask you to state if at the same time and place you made statements to Dr. Fortner that your stepmother told you that she intended to ruin your father, John C. Allen, and that if you ever got caught and told any one that she was the cause of your downfall, she would put you out of the way, and you were afraid of her? Did you make this statement? A. I ain't sure. I think I did. Q. I will ask you if you did not swear that Jim Ivey was the father of your child, and that pursuant to that a warrant was issued, and he laid in jail for about six months; that you finally changed your mind about it and come up and had the case dismissed, and he was discharged? (Objected to as not the best evidence.)

"By the Court: Sustained.

"The defendant offers the record of the district clerk in the case of State v. Jim Ivey. (Objection sustained. Exceptions allowed.)"

George B. Thompson testified that he lived near Jesse, and went to Coffeyville with George Moran, who was a brother of Era Allen's mother, and there found her with a negro family, and she had a baby two or three weeks old that appeared to be a "nigger baby"; that they placed her with a white lady by the name of Williams, called the "city missionary," and ten days later they brought her and the baby back to Ada, and on cross-examination stated that when he went to Coffeyville he knew a prosecution was being started against the defendant; that so far he was furnishing his own money to prosecute the case; that he visited prosecutrix a time or two with her guardian, Frank Johnson.

This was all the testimony on the part of the state.

In behalf of the defendant, J. W. Davis and J. W. Hays, of Ada, testified as impeaching witnesses.

Mrs. Fannie Williams by deposition testified that she was 60 years old, a resident of Coffeyville, Kan., commonly called the "city missionary"; that the prosectrix stayed at her home, and on December 27, 1910, in the presence of her daughter, Mrs. Mary E. Tacket, of Wichita, and Dr. Fortner, she stated in substance that her father, John C. Allen, had always been good and kind to her, and that he wanted her to always be "a little lady," and act nice, and he had nothing to do with and did not know of her wrongful acts; that he was innocent of having had any illicit intercourse with her; that her stepmother had said that she intended to ruin her father, John C. Allen, and, if she ever got caught and told any person that her stepmother had persuaded her to do these acts, that she would put her out of the way, and that she was afraid of her stepmother, and she said that her stepmother had compelled her to give up and submit to Jeff Mills; that these statements were voluntarily made and repeated at different times in the presenc of her daughter and Dr. Fortner. On cross-examination she stated that the baby showed colored blood, and she told prosecutrix that her uncles who brought her to witness' place were trying to implicate her father, and prosecutrix broke down and cried and said that Dick Townsend, a negro, had been with her just about as often as he wanted to, but that the first time she ever did wrong was with Jeff Mills. Witness further stated that she never saw or met the defendant, John C. Allen, nor did she ever receive any letters concerning what her testimony in the case would be.

Dr. C. H. Fortner testified that he was a resident of Coffeyville and a practicing physician. His further testimony was substantially the same as that of Mrs. Fannie Williams.

Mr. and Mrs. W. B. Lumpkin both testified that Era Allen and her baby were brought to their home in Ada in January, 1911, by her uncle, George Thompson, and she stayed there four or five days, that she said "her father never had anything wrong to do with her, but that it was her stepmother who was the

cause of her downfall"; that Mr. Brown, a justice of the peace and the county attorney called and had a conversation with her while she was there.

Chris Myers testified he was a deputy sheriff, and in November, 1910, went to the defendant's house and told the prosecutrix that he was sent by the sheriff to make an investigation; that it had been reported that her father was the man who had got her in the family way; that Dr. Palmer was present, and prosecutrix stated that "her father, John C. Allen, had never had intercourse with her, but that two men, one by the name of Mayo and another man whose name was unknown, both of whom had left the country, had had intercourse with her."

The defendant testified in his own behalf that he had resided in what is now Oklahoma nearly 30 years, was a farmer, and had never been arrested before for any offense; that the prosecutrix was his oldest child, and would be fifteen years of age the 19th of the coming August; that his first wife died in 1906; that his second wife was Agnes Mills, and they lived together about one year, and separated in January, 1910; that he was away from home a good deal of the time, looking after his children's allotments; that in October, 1910, he noticed something wrong with Era, and asked her about her trouble and who caused it, and she said no man had had anything to do with her, and "I couldn't get anything in the world out of her"; that he then sent her to Ardmore, and they sent her back; that he told his daughter that she had brought disgrace upon the family, and it was too late then to recall it, and he would have to make some effort whereby she would get attention and care, so he sent her off; that old Dick Townsend worked for and lived with him; that he went to Coffeyville, and was there the day her child was born, and he thought it was part Mexican, as there were Mexicans on his place; that he never suspected Dick Townsend; that another reason for sending her off was to keep the rest of the children from knowing it; that he then sent the rest of the children to Ardmore to school; that the feeling was unfriendly between him and Thompson and the Morans. He denied having had improper relations of any kind with the prosecutrix.

The record shows that over the defendant's objection the state was permitted to prove by the prosecutrix that she had intercourse with a negro seven months prior to the commission of the alleged offense by the defendant; that she had left the state with this negro; that she had given birth to a negro baby, and was attended by a negro doctor. The precise question here presented has never been decided by the courts of last resort in Oklahoma. In the case of *Morris v. State,* 9 Okla. Cr. 241, 131 Pac. 731, it was held that upon a trial for statutory rape, evidence of other acts of sexual intercourse between the same parties is admissible, including evidence of acts committed subsequent to the particular act relied upon for conviction, even though it tends to prove other offenses, as relevant circumstances tending to show the relation and familiarity of the parties, and continuousness of the illicit relation, thereby tending to corroborate the testimony of the prosecutrix as to the particular act relied on for conviction. However, the doctrine of the Morris case is not applicable to the question under consideration. In the case of *Walker v. State,* 8 Okla. Cr. 125, 126 Pac. 829, it was held that, as a general rule, the prosecutrix cannot be cross-examined as to whether she had sexual intercourse with others than the defendant.

Upon the issue as to the age of the prosecutrix it was an undisputed fact that she was under sixteen years of age. The only other issue involved upon the trial was the fact of sexual intercourse by the defendant with the prosecutrix.

The defendant had a right to have the evidence confined to the issue. This evidence discloses a series of acts and events so revolting and disgusting as to shock the conscience and offend the sense of decency of all but the degenerate, and it in no way, directly or indirectly, connects the defendant with the crime charged in the information. While it is permissible and proper for the state to introduce evidence of any facts or circumstances that would tend to corroborate the prosecutrix, and establish her credibility, the testimony objected to could have no such effect. The only effect this incompetent evidence could possibly have had was to arouse and inflame the passions of the jury to the utmost

extent, and to prejudice them against the defendant. That such would be its natural and necessary effect no one can doubt. It is of such a character that no one with common feelings of humanity can read it without being prejudiced against the defendant for his neglect and carelessness in failing to properly protect and guard the virtue and welfare of his daughter, and that is all it tended to prove. The defendant was not on trial for his delinquency in this respect. It was not claimed upon the trial that the defendant had any knowledge of the libidinous conduct of the prosecutrix until seven months after her pregnancy, and therefore evidence of such prior acts of sexual intercourse with others than the defendant could in no way show or have any bearing on the relations of the defendant with the prosecutrix, nor could it corroborate her testimony to the effect that the defendant had committed the act charged in the information. Neither does the fact that the prosecutrix was delivered of a negro child tend to corroborate her testimony that the defendant, a white man, had sexual intercourse with her. It was therefore incompetent and improper, and should not have been admitted.

It is a well-established principle of criminal jurisprudence that incompetent, irrelevant, and immaterial evidence which tends to excite the passions, arouse the prejudices, and awaken the sympathies, or warp or influence the judgment of jurors in any degree cannot be considered as harmless.

It is our opinion that in this character of cases evidence of specific acts of unchastity on the part of the prosecutrix with others than the defendant is inadmissible, unless shown to be a part of the *res gestae,* and it was prejudicial error to permit the prosecutrix to answer these questions.

Is the evidence sufficient to sustain a verdict? The conviction was based upon the uncorroborated testimony of the prosecutrix, her story was intrinsically improbable, and almost incredible, and she was impeached by every witness who testified in the trial. It was shown that she had at various times charged no less than six other persons with having had criminal intercourse with her. It was also shown by the only other witness for the state, Thompson, that he had instituted proceedings against

the defendant before going with George Moran to visit the prosecutrix in Kansas, and although he brought her back for the purpose of prosecuting the defendant, it is undisputed that it was only after she had been for some time with the Morans that she consented to charge the defendant with having had sexual intercourse with her. With these facts before us, we think that the testimony of the prosecutrix was maliciously inspired, and that the verdict was more the result of prejudice or public sentiment than the calm and dispassionate conclusion of the jury upon the facts in evidence.

The rule is that where the testimony of the prosecutrix bears upon its face inherent evidence of improbability, to sustain a conviction, there should be corroboration by other evidence as to the principal facts relied on to constitute the crime. Especially must this rule be held applicable in a case where the prosecutrix has been successfully impeached. In the case of *Morris v. State, supra,* it is said:

"This court does not hold with some that, as a matter of law, rape cannot be established by the uncorroborated testimony of the prosecutrix, but in common with all courts recognizes that, without such corroboration, her testimony must be clear and convincing. And, where the testimony of the prosecutrix bears upon its face inherent evidence of improbability, there should be corroboration by other evidence, connecting the defendant with the commission of the crime. The law is that the life or liberty of a citizen shall be taken only in case the right to do so is established beyond all reasonable doubt; and, while there is no rule of law which forbids a jury to convict of rape on the uncorroborated testimony of the prosecutrix, provided they are satisfied beyond a reasonable doubt of the truth of her testimony, yet the courts have always recognized the danger of conviction on her uncorroborated testimony, and the testimony of the prosecutrix, if inherently improbable and uncorroborated, will not justify or support a conviction, as the only reasonable conclusion in such cases is that such verdicts are the result of passion or prejudice, and therefore contrary to law."

See, also, *Palmer v. State,* 7 Okla. Cr. 557, 124 Pac. 928.

The questions already discussed are sufficient to dispose of the appeal. The record discloses other rulings, arising during

the conduct of the trial, that would be difficult, if not impossible, to defend.

For the reasons indicated in the opinion, the judgment of the district court of Pontotoc. county is reversed, and the cause remanded thereto, to be disposed of as required by law.

ARMSTRONG, P. J., and FURMAN, J., concur.