JOHNNIE WILLIAMS v. STATE.

No. A-9261. May 21, 1937.
(68 Pac. [2d] 530.)

Eaton & Wheeler, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and James K. Eaton, Co. Atty., for the State.

BAREFOOT, J. The defendant was charged with the crime of rape in the first degree in Okmulgee county. He was tried, found guilty, and convicted by the jury, who were unable to agree upon his punishment, and by the

court sentenced to serve a term of 50 years in the penitentiary. Both the defendant and prosecutrix are negroes. He was 34 years of age and she was 38 years of age, and had been married twice.

The only assignment of error argued in the brief of defendant is that the court erred in refusing to sustain a demurrer to the evidence and the failure of the court to instruct the jury to return a verdict of not guilty, and that the evidence is insufficient to sustain a conviction.

It has often been announced as the policy of this court that it will not set aside the verdict of the jury in a criminal case where there is evidence to support it, and it has been just as much the policy of this court to review with care the evidence which supports the verdict in cases of this character. Long years of experience have convinced courts that the statement so often quoted by Sir Lord Hale, cited in the case of Morris v. State, 9 Okla. Cr. 241, 131 Pac. 731, 736, is fundamentally true:

"It must be remembered that this is an accusation easily to be made and hard to be proved and harder to be defended by the party accused, though ever (never) so innocent."

We have read the record in this case and have studied it from every conceivable standpoint. It reveals contradictory and conflicting statements. The question of time bears an important part in this case, and when this is carefully reviewed it reveals that if the best evidence is to be believed, it would have been impossible for the defendant to have committed this crime as alleged in the information.

Prosecutrix, Leota Smith, testified she is 38 years of age; that she had been married twice and had lived with another man for over a year; that she was employed as a

servant in the home of A. J. Hale, who lived two blocks north of the city limits of Okmulgee; that she generally completed her work so that she could leave for home about 1:30 p. m., and sometimes was detained until 2 or 2:30 p. m.; that on the date alleged in the information she left for home at 1:30 p. m.

In this statement she is corroborated by her employer, Mr. A. J. Hale, who saw her leave.

A map is attached to the case-made showing the route she traveled, and the location of several places which were especially identified by the testimony in this case. She passed the Checotah school, the colored WPA sewing room, where she was seen by at least one witness, by a toolhouse located in the park, and onto a railroad trestle, where according to her testimony she first met the defendant. This railroad trestle, according to the testimony, is located at least a mile and a quarter to a mile and a half from where the prosecutrix worked and from where she had walked. Taking into consideration the distance, the evidence of others who saw her, and the ten or fifteen minutes delay at the railroad trestle, it must have been very near 2:30 p. m., according to her testimony, when she first saw the defendant. She did not know him and had never seen him before. She said he spoke to her and said, "Howdy," and she said, "Howdy," and he said, "I have a job for you;" she answered that, "I have a job." He then said, "I have got a good job for you," and she then testified:

"Q. And then what did you do? A. I started walking off and he says, 'No, come go with me. I got a job for you,' and I says, 'No, I already got a job,' and he says, 'No, you are going with me,' and I started walking off and walked off a piece and he started striking me and says, 'You going with me.' He strike me across the head. Q. Struck

you across the head with his hands? A. Struck me across the head with his gun. Q. What did you do then? A. I started walking off and started turning back and he says, 'You going with me, I got a job for you,' and he hit me again and I started walking off again, and I don't know which way I went, and when I know anything again I was in that field. Q. In a cornfield? A. Yes. Q. What was he doing then? A. When he got there he throwed me down and pulled my clothes off, and when he got through doing what he wanted to do— Q. What condition were you in then,—were you conscious at that time? A. Yes. Q. Do you say that he was the man that was with you in the cornfield? A. He was the man. Q. Tore your clothes off? A. Yes, sir; he is the man. Q. What did he do then? A. He wanted me to suck his private,—told me to suck it and I told him I couldn't do that, and he says, 'Suck it, suck it!' and commenced abusing me and beating me. Q. What did he beat you with? A. All I can remember was his gun —that is all I can say—and then he pulled the trigger on his gun to shoot me, and all I can remember is one shot. Q. Where did he hit you at that time, do you know? A. He hit me on my arm and head. Q. And then do you remember anything else that occurred? A. No, sir, that is all I can remember. Q. Now, do you know whether he is in the courtroom or not, the man that hit you? A. Yes, he is here. Q. Well, where is he? A. There he sits with the white shirt and black tie on. Q. White shirt and black tie? A. Yes. Q. Sitting in the chair or on the bench? A. On the bench."

The evidence showed that the cornfield to which she referred was a distance of one and a quarter miles from the railroad trestle. By her direct and cross-examination she stated she was unconscious from the time the defendant hit her with the gun at the railroad trestle until she woke up in the cornfield and he was "doing that to her," and afterwards shot her. She heard only one shot fired, when she again became unconscious. The evidence of the phy-

sician after examining her, showed that she had been shot five times.

It is almost inconceivable that after being knocked unconscious she could have followed the defendant for a mile to a mile and a quarter to a cornfield where she was afterwards found.

Floyd Mitchell, a witness called by the state, testified that he was working on the farm of Mr. H. E. Neal, just outside the city limits of Okmulgee; that he found the prosecutrix, Leota Smith, about 2:30 p. m., on Tuesday, June 16, 1936, in a cornfield on the Neal farm; that she was unconscious at the time he found her; that she had been wounded; and that he called the sheriff's office and they came and got her. He also testified as to the condition of the premises where she was found, as follows:

"Q. What was the condition of the ground, if you observed? A. Right there where she was at, looked like it had been tromped down or wallowed down. Q. Show signs of a scuffle? A. Not any signs of a scuffle. Q. What do you mean? A. It looked like she had either crawled up there or sitting down maybe she had fell or something. The weeds were mashed down. Q. What condition did you find with reference to tracks? A. Right where she was at there wasn't any tracks but hers. Q. Did you find any close around? A. Well, about I judge 75 yards, something like that, it showed signs of where it looked like two people had fought and the ground was tromped up, and a place I judge, if it had been square, I judge two or two and a half feet square was almost covered with blood and her clothes was all bloody, and it showed a man's track as well as hers where the ground was stomped down where it looked like they had been fighting. Q. Did you observe any tracks, Mr. Mitchell, from the place about 75 feet,— I believe you said? A. About 75 yards. Q. Did you observe any tracks from the place about 75 yards from where she was found up to the point where she was found? A. Her

tracks. Q. And you say she was bloody when you found her? A. Yes, sir. Q. Clothes torn and disheveled? A. Her face and arms and hands had dried blood on them. Q. Did you observe any abrasions or licks? A. When I found her, her hair was matted with cockleburs and trash and dirt."

On cross-examination this witness testified to seeing the prosecuting witness on the day before she was found on the Neal farm.

"Q. How far do you live from this scene where the crime was committed? A. I judge about a quarter to a half mile; I couldn't say. Q. You had seen her that afternoon, hadn't you? A. When was that? Q. Before you went out and found her? A. Not that afternoon. Q. Well, the day before? A. The day before. Q. You saw her—where was she when you saw her? A. Passing along south of Mr. Neal's residence. Q. Did you see anything peculiar about her at this time? A. No, sir. Q. Which way was she going, —toward the scene of the crime? A. Yes, sir. Q. What time of day was it when you saw her going in that direction? A. Well, I judge it was about one o'clock. Q. You didn't look at any timepiece—that is your best judgment? A. No. Q. It wouldn't be as late as 2:30 or 3 o'clock? A. No; I always go to work about one. Q. And she passed there before you went to work? A. Yes. Q. Going in the direction of the scene of the crime? A. Yes. Q. Was she with anybody? A. She was with a man. Q. Were they walking side by side? A. No, he was I judge about ten feet ahead of her. Q. And she was following him? A. Yes. Q. Could you hear them talking? A. I could hear their voices, but I couldn't understand any words. Q. They weren't quarreling or anything, were they? A. I couldn't tell it if they was."

He further testified as follows:

"Q. You wouldn't attempt to say that this defendant is the man,—this man here (indicating). A. Well, I couldn't swear to it. Q. How close were you to him? A. About 75 yards, something like that."

The state offered three witnesses, a colored man named Luke Monteilh, his son, Eddie Monteilh, and his daughter Octavia Monteilh, who were farming in the vicinity, about a half mile from where the prosecutrix was found, and rather close to the route that led from the railroad trestle to the cornfield. Luke Monteilh testified that he was at his home, sitting on the porch, on Monday evening, June 15, 1936, and that he saw a colored man come through his pasture near his house, going south about 2:45 to 2:50 p. m.; that he was about 25 yards from him. He positively identified the defendant and described him as having a beard on his face which was the most striking peculiarity he could mention. Just after the defendant passed the home, he testified that he went into his pasture to shoot some crows and did not see the defendant again until he was arrested several days later and brought before him and he identified the defendant as being the party he had seen at 2:45 or 2:50 p. m. on Monday, June 15, 1936.

His son, Eddie Monteilh, corroborated the testimony given by his father. He testified he was plowing in a field about 150 yards from the house and that he saw the defendant going south about 2:45 or 3 p. m. and testified that he passed about 25 yards from where he was plowing; that he especially identified him by reason of having a beard, which was his outstanding feature; and that he wore blue overalls, a leather cap, and gray shirt. He testified the day he was brought to his home to be identified that he had on the same leather cap he had on the day he saw him pass the house.

The daughter, Octavia Monteilh, testified corroborating her father's testimony, saying that she was sitting on the porch at the time that he first passed the house and positively identified the defendant as being the party who was by there on the same afternoon of June 15, 1936,

about 2:45 or 3 p. m.; that he passed by the house going south about 25 yards from the house; that he had on dirty blue overalls, a leather cap, and "tannish shirt"; that after he passed, her father went into the pasture to shoot some crows that were eating the chickens; that he fired a shot and the defendant began running, and came back near the gate of her home and then made inquiry as to who lived there, and when she did not tell him, he said:

"A. He first asked who lived there and I didn't tell him and he said the reason he asked, he wanted someone to help him with a lady down in the cornfield; said a lady from town was almost cut to death and was hollering for help and he wanted someone to help with this lady. Q. What did you say to him? A. I told him there wasn't anyone else at home at that time. Q. Was there anyone else on the porch with you? A. No. Q. After you said that to him, what did the defendant do? A. He just kept on going. Q. What direction was he traveling when he left then? A. South. Q. Did you see him any more? A. No. Q. Did you see him any more after that day? A. Not till the laws brought him out home to identify. Q. Do you know what day the officers brought him out there? A. The first day he came there I wasn't there, but the following week I was at home. Q. You were there then? A. Yes. Q. Did you notice how he was dressed? A. That day? Q. Yes. A. He had on a kind of a brownish pair of trousers when the law brought him out. Q. Did he have on a cap? A. Yes, he had a cap on that day. Q. Do you remember how he was dressed when you saw him in the pasture that Monday? A. Yes. Q. How was he dressed then? A. Black leather cap and a tannish shirt and a dirty pair of blue overalls. Q. Is the man that the officers brought out there that you saw the same man that is now in the court room to whom you pointed? A. Yes, sir. Q. This is the same man the officers brought there? A. Yes, sir, the same man. Q. Did you observe his overalls with reference to being muddy or greasy or anything? A. I just noticed that they were dirty and it wasn't fitting him neat at all. Q. Wasn't fitting

him neatly? A. No, sir. Q. Did you notice whether there was any dust on his clothing? A. No, sir."

The state next offered four witnesses who were working at the colored WPA sewing room, being on the route from where the prosecutrix worked, and the toolhouse and the railroad trestle were located, and also being on the route from the fair grounds to these places; the evidence of the defendant being that he came by the sewing room from the fair grounds at about the same time that these witnesses testified they saw him pass. The first of these witnesses was Myrtle Adams, who testified that she worked at the WPA sewing room on the 15th day of June, 1936; that she knew the defendant and that his wife worked at the sewing room; that she saw the defendant pass there on that date, going south toward town some time between 1 and 3 p. m. on the afternoon of June 15, 1936; that she had seen the prosecutrix pass there on the same day about five or ten minutes ahead of the defendant.

Dora English testified to seeing the defendant pass the sewing room on Monday afternoon, June 15, 1936, going south toward town; that she did not know the time.

Etta Cole testified to seeing the defendant pass the sewing room some time between 1 and 3 p. m., on the 15th day of June, 1936, and that she had known him for many years.

Lovie Harrington testified to seeing the defendant pass the sewing room going south and walking fast; she did not know the time, but knew it was in the afternoon.

Tom Berry testified that he was a deputy sheriff; that he arrested the defendant after making an investigation after finding the prosecutrix, Leota Smith; he did not take him to the hospital for the prosecutrix to see until he had been arrested for about a week; he testified to find-

ing the prosecutrix in the cornfield about 2:30 or 3 p. m. on the 16th day of June, 1936. She was in a bruised and dazed condition. He further testified as follows:

"Q. Did you investigate the place where she was hurt or try to find the place where she was hurt or wounded? A. She had several cuts and bruises. Q. I know, but did you examine the ground around where you found her? A. I will say that we found as many as three places in the cornfield and in the edge of the creek timber where the grass and weeds had been all knocked down, and articles of clothing—maybe a shoe at one place and maybe a dress at another place. Q. Find any blood? A. Yes, several splotches of blood on the ground at each of these places. Q. What was the condition of this woman's clothes when you found her? A. She had only a small strip of cloth around her waist and down to her knees when we found her—possibly might have been an underskirt. The rest of the body was nude. Q. The place where you found her, was there evidence of a struggle there? A. At the place she was lying when I got out there was in a cornfield, and the ground was freshly plowed and it was packed down, and there was splotches of blood there. Q. Did you find any tracks there or anywhere else in that cornfield? A. I would say 25 feet from there possibly, across a little corner of the field where a fence was, there was a man's track and a woman's track. Q. Was there more than one man's track? A. No; one man's track and a woman's track. Q. But several tracks? A. Yes, sir. Q. When did you arrest the defendant? A. I couldn't say exactly; possibly three or four days later."

On cross-examination he stated at the time she was found in the cornfield she said: "That she had killed a chicken and got that blood on her"; that she was irrational when she made this statement. On recross-examination he testified:

"Q. Did you ask her how she got hurt? A. Yes, sir. Q. What did she say? A. She didn't realize she was hurt; she said she had rheumatism a few years ago, and she

406

thought that was what was the matter. Q. Did you ask her who hurt her? A. Yes, sir. Q. What did she say? A. She still didn't know she was hurt."

The defendant, testifying in his own behalf, said: He was 34 years of age; that on June 15, 1936, and prior to that time he was working for Mr. Bryan Bricken, a white man, who lived in Okmulgee; that he went out to his place to go to work about 8:15 a. m. on that date, but as it was hot and dry and he had caught up with his work, Mr. Bricken did not need him that day and he went back toward town, stopping at the Dawson Produce Company, where he had formerly worked, helping to unload cars of produce; that he worked a little while there helping them there and they gave him some tomatoes; that he saw several people whom he knew there, among them being the proprietors and others with whom he had worked; leaving there about 10 a. m., he went to Fifth street and Muskogee avenue to a salvage place, where he tried to sell a Ford motor which he had; just before he got there he met up with William Tunley, who went with him, and who testified to this effect at the trial. After staying there a few minutes, he went to the home of William Tunley, staying there until about noon, going to his home and stopping at the home of L. L. Jackson and wife about 15 minutes; they lived about four blocks north of where he lived. After leaving the Jackson home he went to the home of his father, who was very old, to see his small boy. After being there about 20 minutes he went to his own home, where his mother-in-law, brother-in-law, and his brother-in-law's wife were. He arrived there about 1 p. m., fed his chickens and had lunch, stayed there until about 1:25, at which time he went to the post office in Okmulgee; his purpose in going there was to see his brother, who, with the other "ex-service" men of Okmulgee, were going to draw their "bonus money"

on that date. He was going to borrow some money from his brother. His brother and others corroborated this testimony and also as to his being at the post office and of seeing him there. They also corroborated him as to the time he was there and the time that he left. He said that he left there just about 3 p. m. and went to the fair grounds. Some of the others testified that it was around 2:30 p. m. His purpose in going to the fair grounds was to attend a public sale which was held there each Monday. He was going for the purpose of trying to buy two pigs. The man for whom he worked, Mr. Bricken, and from whom he had tried to buy pigs that morning, told him of the sale at the fair grounds and told him that he could probably buy them cheaper there. He was corroborated in this testimony by his former employer, Mr. Bricken. He testified that when he got to the fair grounds the sale was nearly over; that he remained there about 30 minutes; that he did not see Mr. Bricken, his former employer, but Mr. Bricken testified that he attended the sale and saw the defendant just about the time the sale was breaking up, and to his best judgment it was about 3 p. m. His testimony was as follows:

"Q. What day of the week do they hold those sales? A. Every Monday. Q. About what time of day was it when you saw him out at the sale? A. Well, I think it must have been around 2:30 or 3 o'clock,—might have been after 3 —I might have been out there quite a while before I saw him. I generally go out there about 1:30 or 2 o'clock. Q. And did you leave him there, or do you know? A. I don't know. Q. What time did you leave the sale? A. I left the sale about 4:30."

On cross-examination, he testified as follows:

"Q. Do you know what time you went to the sale on that day? A. It was between one and two o'clock. I always bring my wife to town about one o'clock. Q. Did you that

day? A. Yes, sir. Q. Where to? A. The office — Doctor Marr's office,—dentist office, where she works there. Q. And you bring her there about one o'clock? A. Yes, sir; and I always go to the sale on Monday. Q. And you went to the sale from the dentist's office? A. Yes, sir. Q. And you got to the sale about one o'clock? A. Days—some days she don't go back till 1:30. Q. But you don't know what time she went back that day? A. No, I don't know just exactly what time. Q. And you don't know what time you saw the defendant out there that day, do you? A. No, I don't know,—I wouldn't state."

On redirect examination he testified:

"Q. What time do you fix? A. I don't think I had been out there very long when I saw him. I imagine around three o'clock or a little after."

On recross-examination he testified:

"Q. How long do you think you had been there? A. I bought several hogs there that day. I think I had already bought quite a bunch of hogs when I saw this fellow there. I just happened to notice him in the doorway of the sale. I was back in there buying hogs and he was standing in the doorway—I just happened to notice him. I don't know just what time it was."

The defendant testified that he stayed at the fair grounds about 30 minutes, and as he started to leave he met a man, while getting a drink at the hydrant, who lived out in the country. He talked to him about buying some hogs and about going out to the country and working for him, chopping cotton. His testimony in this respect is as follows:

"A. It wasn't but one man, the one that got the drink of water. When we got the drink of water, he said: 'I will sell you some hogs cheap; you come out to my place and chop cotton, 25 acres to chop, and got corn to hoe out and plow,' and says, 'When you say you come out there, about the middle of the week?' and I says, 'I don't know; where

do you live?' and he tried to tell me, and I says, 'I don't know anything about that country,' and he says, 'I will give you my name and if you can't find me, I will give you one or two more men's names and if you can't find me, one of these men will identify me,' and says, 'Can I depend on you?' and I says, 'Sure,' and that is the last time I seen him. Q. Did you write the names on a piece of paper? A. He did. Q. How many names did he write? A. His name and two more. Q. What did you do with the paper? A. I put it in my overalls pocket, and I was helping Walter with his car and I lost it somewhere. Q. Who was it you were helping with his car? A. Walter Mc-Cowan."

When he left the fair grounds he started to town and went by the sewing room and to the toolhouse. He thought this was just a short while after 3 p. m. In going to the toolhouse it was necessary for him to pass near the sewing room and in this respect he is corroborated by all of the women who testified as to his going by this room. After passing the sewing room he went on south toward the toolhouse. This was after 3 p. m., and at or near the toolhouse he met a man by the name of Walter McCowan, who was employed in the park, and who was working on his car. The defendant stopped and helped him fix a tire, and when that was finished he got in the car and rode back with him to his home in Okmulgee. The defendant stopped at a certain grocery store, where the witness made a purchase, and after going to his home McCowan walked with the defendant over to his own home. This was just about 4 p. m., and the witness McCowan fixed this time because he got off work at 3:30 p. m. and had been about 30 minutes fixing the tire when the defendant walked up and assisted him. He had known the defendant 18 years, and said that he came up from the east, which would be in the opposite direction from the railroad trestle or the cornfield where the prosecutrix was found.

On rebuttal the state offered in evidence the testimony of a witness by the name of John Taylor. The testimony of this witness offered by the state corroborates in every detail the testimony of this defendant, and the witness McCowan, and absolutely disproves almost every theory advanced by the prosecution in this case as to the guilt of the defendant. His testimony is as follows:

"Q. Did you know Johnnie Williams on the 15th day of June, of this year? A. Yes, sir. Q. Did you see him on that day? A. Yes, sir. Q. Where? A. Over here at the park, —Okmulgee park. Q. Is that the park south of the fair grounds? A. Yes, sir. Q. And adjoining the fair grounds? A. Yes, sir. Q. What time in the day did you see him there? A. Well, it was about 3:30 in the evening. Q. Where did you see him with reference to the tool house on the corner of that park? A. Well I was up there at the dressing room, at the swimming pool. Q. How far is that from the tool house? A. One hundred or one hundred thirty yards. Q. Did you see him down there at the toolhouse? A. No, sir; I went down after him. Q. What was he doing down at the toolhouse? A. Him and McCowan was working with McCowan's car, trying to get it started."

On cross-examination he testified as follows:

"Q. And you left them there, didn't you? A. Yes, sir. Q. And they didn't overtake you on the way home? A. Sure, they passed me. Q. Where? A. Passed me before I got to the corner going up to the hospital."

As above stated the evidence in this case is contradictory and conflicting and highly unsatisfactory. The evidence of the prosecutrix and her employer, Mr. A. J. Hale, shows that she left the Hale home at 1:30 p. m. She reached the railroad trestle, a mile and a quarter away, where she met the defendant at about 2:30 p. m. She was there knocked unconscious by the defendant, who struck her over the head with a pistol. She did not regain consciousness until she was in the cornfield, which is

a distance of a mile and a quarter from the railroad trestle. She knew nothing as to how she got to the cornfield. Taking into consideration the distance, the time consumed in the assault in the cornfield, it is almost inconceivable that this distance could have been made and the assault accomplished before at least 4:30 p. m., yet the only witnesses who corroborated the prosecutrix, the Monteilh family, say that they saw the defendant pass their home between 2:45 and 3 p. m. If their evidence is true, the assault must have already been completed because the daughter Octavia testified that the party whom she saw returned to the house and related to her that a woman had been injured in a cornfield and he wanted to get help. The witness Floyd Mitchell, who was a state witness, testified that he saw the prosecutrix going down the road, following some man toward the cornfield about 1:30 p. m. This, according to all the evidence, was about the time she left her employer's home, and the cornfield was about two and a half miles from this point. The evidence of the four women at the sewing room was that they saw the defendant pass this point between 1 and 3 p. m. At this time he was traveling in a southerly direction, which would be toward the cornfield and not away from it. The testimony of these four witnesses corroborates the defendant's testimony, both as to the direction he was going, and about the time he went to the toolhouse for the purpose of attempting to sell the witness McCowan a Ford motor which he had, and where he helped the witness McCowan fix his tire and return home with him in the car of McCowan. The witness John Taylor, who was not very friendly with the defendant, testified in rebuttal for the state, swore positively that he saw the defendant going from the north to the south about 4:30 p. m.; that the defendant passed him and spoke to him. This was just after he had passed

the sewing room as defendant had testified. He saw him talking to the witness McCowan and also helping him with his car, and he saw the defendant get in the car and come toward town just as the defendant and McCowan testified. The direction from which he came when he spoke to John Taylor was directly opposite from the direction of the cornfield where prosecutrix was found, and was a distance of a mile and a half therefrom. The direction from which he saw him coming was from the fair grounds, where the defendant said he had been just prior to the time that he came to the toolhouse. It is true that the witness John Taylor swore that the clothing of defendant was dirty and that he seemed excited, but this is an insignificant circumstance as compared to the time he saw him, and the direction from which he came.

The only testimony in this record substantially corroborating the testimony of the prosecutrix is the positive identification of defendant by the Monteilh family. The defendant was brought before them after he was arrested, for the purpose of identification, just as he was brought before the prosecutrix at the hospital about ten days after he was arrested, and while their testimony is positive, it is contradictory to so much of the testimony in this case and to the physical facts, one cannot but believe that there was error in their identification of the party whom they saw as being defendant. In the first place, he was 25 yards away from them. They had never seen him before. The main feature by which they identified him was his beard, yet he was clean shaven at the time they made the identification. No other witness who saw him that day testified as to his having a beard. The prosecutrix herself dd not even testify to that. Surely if his beard had been long enough to be a distinguishable characteristic at a distance of 25 yards, it would have been

noticeable to other witnesses and they would have so testified.

In the case of MacLaurin v. State, 34 Okla. Cr. 324, 246 Paac. 669, 671, this court, speaking through Judge Doyle, says:

"It is true that this court has held many times that there is no rule of law which forbids a jury to convict for the crime of rape on the uncorroborated testimony of the prosecutrix, provided they are satisfied beyond a reasonable doubt of the truth of her testimony. It does not follow, however, that a conviction upon such testimony is to be arbitrarily sustained under all circumstances."

And the same Judge, in the case of Morris v. State, 9 Okla. Cr. 241, 131 Pac. 731, says:

"This court does not hold with some that, as a matter of law, rape cannot be established by the uncorroborated testimony of the prosecutrix, but in common with all courts recognizes that, without such corroboration, her testimony must be clear and convincing. And, where the testimony of the prosecutrix bears upon its face inherent evidence of improbability, there should be corroboration by other evidence, connecting the defendant with the commission of the crime. The law is that the life or liberty of a citizen shall be taken only in case the right to do so is established beyond all reasonable doubt; and while there is no rule of law which forbids a jury to convict of rape on the uncorroborated testimony of the prosecutrix, provided they are satisfied beyond a reasonable doubt of the truth of her testimony, yet the courts have always recognized the danger of conviction on her uncorroborated testimony, and the testimony of the prosecutrix, if inherently improbable and uncorroborated, will not justify or support a conviction; as the only reasonable conclusion in such cases is that such verdicts are the result of passion or prejudice, and therefore contrary to law."

Judge Furman, in the case of Reeves v. Territory, 2 Okla. Cr. 351, 101 Pac. 1039, 1043, first announced the

rule of this court that there might be a conviction upon the uncorroborated testimony of the prosecutrix, but in the closing paragraph of this opinion says:

"While the court should not instruct the jury that it is necessary to corroborate the testimony of the prosecutrix in order to convict a defendant of rape, yet the want of such corroboration should be considered by the court, in connection with all the facts and circumstances of the case, either in advising the jury to acquit the defendant, or in considering a motion for a new trial."

See, also, Douglas v. State, 19 Okla. Cr. 257, 199 Pac. 927; Ferbrache v. State, 21 Okla. Cr. 256, 206 Pac. 617; Allen v. State, 10 Okla. Cr. 55, 134 Pac. 91; Cape v. State, 61 Okla. Cr. 173, 66 Pac. (2d) 959, 960; McDonald v. State, 61 Okla. Cr. 287, 67 Pac. (2d) 806, State v. Goodale, 210 Mo. 275, 109 S. W. 9, 11. In the last cited case the Missouri Supreme Court says:

"While it is the law of this state, as in most others, where not modified by statute, that a conviction for rape may be sustained upon the uncorroborated evidence of the outraged female, it is nevertheless equally well settled that the appellate court will closely scrutinize the testimony upon which the conviction was obtained, and, if it appears incredible and too unsubstantial to make it the basis of a judgment, will reverse the judgment."

In view of the contradictory and unsatisfactory evidence in this case, and the fact that practically every witness used by the state tended to corroborate the statement made by the defendant, with the exception of the positive identification of the defendant by the Monteilh family, and the uncertainity of this testimony being correct as to the defendant being the party whom they saw, we cannot do otherwise than reverse and remand this case.

It is true that the prosecutrix was assaulted and the perpetrator of this crime should not go unpunished, but

the evidence as to the defendant being the party who did it is not only conflicting and unsatisfactory, but is highly improbable. This testimony in conjunction with the physical facts, and the corroboration of the defendant by the state's own witnesses, leads to but one conclusion—that there was a case of mistaken identity.

If other evidence is obtained which the state deems sufficient, the case may be retried, but as the record stands justice demands a reversal of the same, and it is so ordered.

DAVENPORT, P. J., and DOYLE, J., concur.