MERLE FITZPATRICK v. STATE.

No. A-10796. March 17, 1948.
Rehearing Denied June 9, 1948.
(194 P. 2d 184.)

A. V. Dinwiddie, of Guthrie, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., and Sam H. Latti-more, Asst. Atty. Gen., for defendant in error.

BRETT, J. This appeal was perfected by Merle Fitz-patrick, defendant below, from a conviction for incest committed upon his 15-year-old daughter, Jeannine. The jury fixed the punishment of the defendant by imprisonment in the State Penitentiary at McAlester, for a period of 10 years and the judgment and sentence of the district court of Logan county was in accord therewith.

The only question raised by .the appeal is that the evidence is insufficient to support the conviction.

The state's case is based primarily, as it would naturally be in a case of this kind, upon the testimony of the defendant's daughter, the victim of the father's uncontrollable lust. Her testimony in substance is substantially as follows: Though she said her father had had intercourse with her six different times, the evidence of the state revolves around three different occasions and the conviction herein is based upon the alleged intercourse of March 30, 1945, as pleaded in the information. Jeannine Fitzpatrick testified that the first act of sexual intercourse took place under circumstances substantially as follows: She said that about a week after Christmas or about the 1st of January 1945, her father went to town and was gone until about midnight. She said that her mother, her older brother Eugene, 18 years of age, Noma, Mildred and Pauline Lovelady had gone hunting. That she and her brother Joe, 7 years of age, and her sister Merlene, 10 years of age, were left at home and were in their bedroom asleep. That her father came home about 11 or 12 o'clock and awakened her and told her to get him some supper. That she got up out of bed in her nightgown. That after she got up he suddenly decided

that he didn't want any supper and told her that he did not. He told her to go into his bedroom. She told him that she did not want to go in there and he made her go in. That he pushed her into the room and closed the door. That when he got her into the bedroom he told told her to lay down on the bed and she told him she wasn't going to do it. He then said to her, "Fatherly is the father that opened the daughter's womb." She further testifed, "he said that was a statement out of the Bible and that it wasn't wrong." Again she said he told her to lay down on the bed and upon her refusal so to do he pushed her down on the bed and had sexual intercourse with her at that time and place. She said it hurt her private parts. When he had completed the intercourse she got up and went back to bed. She testified on cross examination that the reason she did not tell her mother, her brother, and the Lovelady girls about it was because she was scared. About five minutes later her mother, her brother Eugene, and the Lovelady girls returned from hunting skunks and opossums.

In relation to this incident the defense offered proof on the part of the brother Eugene and one of the Lovelady girls to the effect that they saw the father's automobile drive up when they were about a half block away from the house and that when they arrived at the house he was building a fire in the kitchen stove, apparently in preparation for fixing his supper. The father denied that he had sexual relations with his daughter. His testimony is corroborative of the circumstance as to the opportunity, to the effect that he did arrive before the hunting party returned to the house and that he did wake her up for the purpose of fixing supper. It has been held that:

"Opportunity may be considered as one of the circumstances, but it is not 'corroboration', and cannot be considered on the subject of corroboration." Alcorn v. State, 70 Okla. Cr. 386, 106 P. 2d 838.

Jeannine Fitzpatrick testified that the second time her father had intercourse with her was about two weeks later. She said her father left the house, she thought, to go to the neighbors. She said that after he had been gone some little time she left the house to go to the outside toilet; that he saw her before she returned to the house. That there was a pile of baled hay out behind the toilet. When she first saw him she didn't think anything about it. He then told her to come out by the hay pile and she said she then knew what he was going to do. She said it was quite dark and the rest of the family was in the house. When they got to the hay pile he told her to lay down and she said she was not going to do it, but he pushed her down, and held her hands and had a second act of sexual intercourse with her. In relation to this act of intercourse, the father said no such thing ever occurred. Jeannine Fitzpatrick testified that after this second act of intercourse, the next day she told her mother about it. She said that four acts of intercourse occurred following the first two which she testified about.

The last act of intercourse concerning which she testified, is the one alleged in the information. She said it took place on March 30, 1945. The way she fixed the date was because it was the day following her little brother's birthday. She said that her mother and her uncle and aunt, Mr. and Mrs. Lloyd Parker, from Wichita, Kan., had driven to Muskogee on business. That on their return from Muskogee they brought a birthday cake. That that day she and her brothers Eugene and Joe and her sister went to school and that they returned home on

the bus about 4:30 that afternoon. That when she came home she immediately started washing dishes. That her older brother Eugene changed his clothes and went to help his father who was plowing in the field about a quarter of a mile away. That after her brother left and had been gone a few minutes, her father came in. He told Merlene, the little sister and her little brother Joe to feed the chickens and gather up the eggs and that when they got through they would go to the show. That left just her and her father in the house together. Her testimony in relation to this act of intercourse, in response to a question to relate what happened, is as follows, to wit:

"He told me to stop doing dishes and to go in his bedroom and I told him I wasn't going to do it, and he told me that he wouldn't give me any more lunch money or anything if I didn't, and I told him I didn't care, and he pushed me in his bedroom and then he told me to lay down, and I told him I wasn't going to do it and he pushed me onto the bed, and then he had sexual intercourse with me, for the last time."

She said that he then told her she didn't need to fix any supper that night, that "we would go to town and eat and go to a show." That he then went after the cows. That about dark Eugene unharnessed the horses and fed them. That her father had already got the cows in and separated the milk. That they then got ready and started in to town to eat and to go to the show. She said that they all loaded into the pick-up and started to Guthrie, but that they had only gotten a little ways down the road when they saw her aunt, uncle and mother pass them. They then turned around and went back home. When they got home her mother prepared supper. That they all had some of the birthday cake which her mother had brought home as a surprise for her little brother, Joe, whose birthday they had celebrated the day before.

She further testified in response to a question as to what, if anything, her father said to her about her menstrual periods from the first to the last act of sexual intercourse, as follows: "He always wanted to know if they were regular." She said that she had told her mother about these acts of intercourse and she said her mother called her daddy in and accused him in her presence. On April 26, 1945, her mother committed suicide.

She said that she had never run around with boys and that she had never had acts of sexual intercourse with anybody other than her father. In this connection, Doctor P. B. Gardner, who testified at the preliminary hearing, but who had since died, testified that he examined her on April 28, 1945, two days after her mother died. He said that in his opinion he was sure that Jeannine Fitzpatrick had had sexual intercourse. The state did not see fit to cross-examine Doctor Gardner. His evidence stands uncontradicted in the record.

The record shows that later on she left Guthrie and went to Wichita, Kan., and later on to Kansas City with a girl friend. She said that the reason she did that was because she thought everybody knew about it and she couldn't stand it.

Jeannine's 10-year-old sister, Merlene Fitzpatrick, testified that she and Eugene, Joe and Jeannine went to school on March 30th. That she could remember the day in question because it was the day after Joe's birthday. That when they came home from school, her brother Eugene went and relieved their father who was plowing and her father came to the house. She said that when her father got to the house he told Joe and her to go gather the eggs. That they went to hunt eggs in the chicken house, out by the toilet and around the turkey

pen, and that they gathered a half a bucket of eggs. That when they got through gathering the eggs they fed the chickens and that during this time her daddy and Jeannine were in the house. That her brother Eugene came back from the field about dark. That she does not know where her father and sister were while they were gathering eggs and doing the chores.

Jeannine's grandmother, Mrs. Mamie Price, testified that the day after the death of her daughter, Goldia, she was in the Fitzpatrick yard crying. That Jeannine came out of the house and put her arms around her neck and went to crying too and that she told her what had happened between her and her father. That her daughter, Rosemary, came out into the yard and that both she and Jeannine told her about it. She said that Rosemary then went back into the house and got her husband. That they left and went to the home of Mr. Adams, the county attorney. It is pertinent to note here that the story related by Jeannine Fitzpatrick at the trial is apparently the same that she testified to on the preliminary hearing. The record does not disclose and no one testified to any conflicting or contradictory statements as to the acts of sexual intercourse which Jeannine Fitzpatrick testified occurred between her father and herself. In other words, she doesn't tell one story to her grandmother, testify to another story on the preliminary hearing, and then tell another story at the trial of the case on its merits. Neither is her story improbable. This being true, her story needs no corroboration if the jury believed she was telling the truth. Beginning with Reeves v. Territory, 2 Okla. Cr. 351, 10 P. 1039, this court has long adhered to the rule that a conviction may be had upon the uncorroborated testimony of a prosecutrix in cases of this kind.

See in this connection, Morris v. State, 9 Okla. Cr. 241, 131 P. 731, 735, wherein it was said:

"This court does not hold with some, that, as a matter of law, rape cannot be established by the uncorroborated testimony of the prosecutrix," and then says, "where the testimony of the prosecutrix bears upon its face inherent evidence of improbability, there should be corroboration by other evidence, connecting the defendant with the commission of the crime."

Such has been the consistent rule of this court. See Ferbrache v. State, 21 Okla. Cr. 256, 206 P. 617; McLaurin v. State, 34 Okla. Cr. 324, 246 P. 669; Williams v. State, 61 Okla. Cr. 396, 68 P. 2d 530; Self v. State, 62 Okla. Cr. 208, 70 P. 2d 1083; Matherly v. State, 62 Okla. Cr. 418, 71 P. 2d 1094. See, also, Alcorn v. State, supra, wherein this court said:

"While a conviction for statutory rape may be had on the uncorroborated testimony of the prosecutrix, this is only warranted when all the other facts and circumstances of the offense are corroborative of her testimony and her statements are not inconsistent or contradictory."

You may search this record from one end to the other and you will not find any contradictory statements made by Jeannine Fitzpatrick as to these alleged acts of intercourse. She never varied her story—it was the same all the way. It is true that her testimony, in relation to the opportunity afforded for the first act of intercourse, is denied by her brother Eugene and by the Lovelady girl. It is also true that her father expressly denied that he had intercourse with his daughter. But, the mere fact that other witnesses contradict her story of the incident as alleged in the information and as established in the record does not render her testimony "inherently improbable", inconsistent and contradictory it-

self, and of such a character requiring corroboration. It merely creates an issue of fact to be decided by the jury. The evidence offered by Jeannine Fitzpatrick, not being inherently improbable, conflicting, inconsistent, or contradictory, requires no corroboration. But, for the sake of argument, assuming that her evidence was of such a nature as to require corroboration, we believe the record affords ample evidence, highly corroborative of the incidents and things concerning which she gave testimony. The testimony of Doctor Gardner as to the fact that she had had intercourse corroborates her. The record discloses that she never had dates with any boys; this corroborates her. She is corroborated by her little sister, Merlene Fitzpatrick, 10 years of age, as to the facts affording opportunity for the accomplishment of the acts of intercourse performed by the father upon Jeannine. The fact that she told her mother of these acts of intercourse, after the second time, is corroborative of her story. Merle Fitzpatrick, the father, admits that his wife accused him of having relations with Jeannine some time before his wife's death. He testified that the occasion for the accusation was the finding of Jeannine's stained underwear among the soiled clothes and that that was when she called the daughter in and confronted him. But, he admitted that she had mentioned it several times to him before. Another fact that is corroborative of Jeannine's evidence is the fact that while she was in Wichita, Kan., her brother came to her and tried to get her to change her story. He testified that: "She said she was telling the truth and that is all I could say." Another strong circumstance corroborative of her testimony is the fact that when 30 days after she told her mother, her mother committed suicide. She just couldn't stand it.

A very strong circumstance, lending credence to the prosecutrix' story and which no doubt influenced the jury in weighing the evidence, was the statement the father made immediately before he accomplished his first act of intercourse with his daughter, to the effect that; "Fatherly was the father that opened the daughter's womb. That's a statement from the Bible and that it wasn't wrong." No doubt the jury was of the opinion that a child 14 years of age, though she be of so ever a contriving mind, would not have thought of such a statement. Another thing that lends credence to the prosecutrix' story which was persuasive on the jury in weighing the evidence, was the fact that her father was so solicitous with reference to her menstrual periods. Another thing that apparently appealed to the jury in weighing the evidence was when he accomplished the last act of intercourse—the fact that "he told me he wouldn't give me any lunch money or anything if I didn't." Moreover the testimony of the prosecutrix in relation to the first two acts of intercourse are corroborative of the act relied upon as charged in the information. As was said by this court in Pruett v. State, 35 Okla. Cr. 359, 250 P. 1029, 1031:

"In a prosecution for incest, evidence tending to establish acts of incest at times other than and prior to that relied on for the conviction is admissible as indicating continuousness of the illicit relation and as tending to corroborate the testimony of the prosecutrix as to the particular act relied on for conviction."

As we have hereinbefore said, her story, not being inherently improbable and not being conflicting, inconsistent or contradictory but being consistent throughout, it requires no corroboration. But, conceding that it does require corroboration, there is sufficient corroboration of

her story as revealed by this record to create an issue of fact for the jury.

It was further held in the Pruett case, supra:

"In a prosecution for incest, whether there was any corroborating testimony supporting the prosecuting witness was a question of law for the court, but its sufficiency was a question of fact for the jury."

See, also, Ellsworth v. State, 10 Okla. Cr. 452, 137 P. 1188, 1189; Williams v. State, 14 Okla. Cr. 195, 169 P. 655. This rule, as to the sufficiency of corroboration being a question of fact for the jury as announced by Pruett v. State, supra, [62 Okla. Cr. 418, 71 P. 2d 1098] was cited with approval in Matherly v. State, supra. Therein, it was said:

"The question of the sufficiency of the corroboration is a question of fact for the jury."

This court has repeatedly held that if there is a conflict in the evidence or different inferences may be drawn therefrom, it is the province of the jury to weigh the evidence and determine the facts and that the jury is the exclusive judge as to the weight of the evidence. That where there is a direct conflict in the evidence, or it is such that different inferences may be properly drawn from it, the jury's determination will not be interfered with upon the ground that the evidence is insufficient to sustain a conviction where there is competent evidence in the record from which the jury might reasonably conclude that the defendant is guilty. See Drennon v. State, 69 Okla. Cr. 348, 102 P. 2d 952; Smiley v. State, 72 Okla. Cr. 100, 113 P. 2d 838; Salisbury v. State, 80 Okla. Cr. 13, 156 P. 2d 149; Graham v. State, 80 Okla. Cr. 159, 157 P. 2d 758, 759, a recent case, wherein this court said:

"Where the evidence is conflicting, the weight of the evidence and the credibility of the witnesses is for the

jury, and Criminal Court of Appeals will not substitute its judgment for that of the jury where there is evidence reasonably tending to support the conclusion arrived at by the jury."

Wirth v. State, 79 Okla. Cr. 59, 151 P. 2d 819, 820, wherein this court said:

"Where the evidence is conflicting and that offered by the State is sufficient to sustain the judgment and sentence, the same will not be set aside on appeal."

While we are not unmindful, as is set forth in the dissenting opinion and as has been repeatedly held by this court, that the charge of rape or incest or illicit sexual relations is one that is easily made and often inspired by malice, hidden motives, or revenge, and evidence to establish the same may be easily fabricated and hard to disprove. And, as has been well stated by an eminent jurist:

"There is no class of prosecution attendant with so much danger or which affords so ample an opportunity for free play of malice and private vengeance, in which case the accused is almost defenseless."

Even in the face of this danger, this court is not warranted in invading the province of the jury to weigh the evidence except in cases as have hereinbefore been set forth where the testimony of the prosecuting witness is inherently improbable, conflicting, inconsistent, and contradictory. No such situation confronts the court in the case at bar. The jury having had the opportunity to hear the evidence of the witnesses and to observe their demeanor on the witness stand and the weight of the evidence being sufficient to sustain either the prosecution or the defense created an issue of fact for the jury, under the law. The situation being thus as it is, we must affirm the judgment and sentence pronounced herein.

JONES, J., concurs. BAREFOOT, P. J., dissents.

BAREFOOT, P. J.   I find that I am unable to agree with the majority opinion in this case, and desire to state my views of the law applicable to the facts presented in this case.

I think the majority opinion is based upon the general rule announced in criminal cases, that this court will not interfere with the verdict of the jury or judgment of the trial court where there is a conflict in the evidence, or where there is competent evidence in the record "from which the jury might reasonably conclude that the defendant is guilty." This is indicated by the cases cited in the majority opinion. To my mind, this does not take into consideration the rule so often announced that in rape or incest cases, the appellate court will closely scrutinize the testimony upon which the evidence was obtained. The opinion also comes to the conclusion that the evidence in the record is not "inherently improbable, conflicting, inconsistent or contradictory", but does not state that the prosecutrix was not impeached. The record reveals that numerous witnesses testified that the reputation of prosecutrix for truth and veracity was bad, and that this was true at a time prior to that when the charges were filed in this case.

Defendant sets out seven assignments of error, but in his brief only one is discussed, namely, "that the verdict is contrary to the evidence, and the evidence is insufficient to sustain said verdict."

A discussion of this proposition is fully set forth in the brief of defendant, but not a single authority from this state is cited in support thereof. In the answer brief of the state, a strong argument is presented to uphold the judgment and sentence, but not an authority is cited.

Briefs of this character may be helpful, but it is left to the court to search out the applicable cases decided by this court before writing an opinion; and the writer of this dissenting opinion finds numerous cases from this court that shed light for a proper decision in this case.

The rule has often been announced that in the consideration of the sufficiency of the evidence in an incest case, the same rule will be followed as in an examination of the evidence in a rape case. Matherly v. State, 62 Okla. Cr. 418, 71 P. 2d 1094.

In the case of Self v. State, 62 Okla. Cr. 208, 70 P. 2d 1083, 1093, which was where a father was charged with rape of his thirteen-year-old daughter, this court said:

"The charge of illicit sexual relations is easily made, and often inspired by malice, hidden motives, or revenge, and evidence to establish the same may be easily fabricated and hard to disprove. As has been well stated by an able jurist: 'There is no class of prosecution attended with so much danger, or which affords so ample an opportunity for the free play of malice and private vengeance. In such cases the accused is almost defenseless.'

"In our opinion no person charged with crime should be convicted on such improbable, inconsistent, and unreasonable testimony as that given by the prosecutrix in this case.

"Our conclusion is that the evidence was insufficient to justify or sustain the verdict, and that the verdict was more the result of prejudice than the calm and dispassionate conclusion of the jury upon the facts in evidence."

Citing: Morris v. State, 9 Okla. Cr. 241, 131 P. 731; Ferbrache v. State, 21 Okla. Cr. 256, 206 P. 617; Witt v. State, 29 Okla. Cr. 357, 233 P. 788; Palmer v. State, 7 Okla. Cr. 557, 124 P. 928; McLaurin v. State, 34 Okla.

Cr. 324, 246 P. 669; Douglas v. State, 19 Okla. Cr. 257, 199 P. 927; Reeves v. Territory, 2 Okla. Cr. 351, 101 P. 1039.

The early cases above cited announced the law and rules of evidence as applicable to rape and incest cases, and they have been followed by the later decisions of this court: Weston v. State, 77 Okla. Cr. 51, 138 P. 2d 553, and all cases cited therein; Self v. State, supra; Kilpatrick v. State, 75 Okla. Cr. 28, 128 P. 2d 246, and 71 Okla. Cr. 129, 109 P. 2d 516; Williams v. State, 61 Okla. Cr. 396, 68 P. 2d 530; Coppage v. State, 76 Okla. Cr. 428, 137 P. 2d 797.

Without quoting extensively from these cases, it may be stated that it has been held that one charged with the crime of rape or incest may be convicted upon the uncorroborated testimony of the prosecutrix, but when this rule is applied, the testimony of the prosecutrix must be clear and convincing, and her testimony should not bear on its face inherent evidence of improbability, and she should not have been impeached or substantially contradicted. It has also been held that the appellate court will closely scrutinize the testimony upon which the conviction was obtained, and if it appears incredible and too unsubstantiative to make it the basis of a judgment, such judgment will be reversed.

As was stated in the case of Williams v. State, supra [61 Okla. Cr. 396, 68 P. 2d 531]:

"It has often been announced as the policy of this court that it will not set aside the verdict of the jury in a criminal case where there is evidence to support it, and it has been just as much the policy of this court to review with care the evidence which supports the verdict in cases of this character. Long years of experience have

convinced courts that the statement, so often quoted, by Sir Lord Hale, cited in the case of Morris v. State, 9 Okla. Cr. 241, 131 P. 731, 736, is fundamentally true:

"'It must be remembered that this is an accusation easily to be made and hard to be proved and harder to be defended by the party accused, though ever so innocent.'"

Applying the rules of law as above announced, I find the following facts in the instant case:

Defendant was charged in the district court of Logan county by information filed June 8, 1945, with the crime of incest on his daughter, Jeannine Fitzpatrick, age fifteen, on March 30, 1945.

The prosecutrix testified that defendant had intercourse with her upon about six different occasions. Two of the times, one the latter part of December, 1944, and one on March 30, 1945, are the specific dates about which the evidence revolves, and one other time is mentioned by prosecutrix, but the date thereof is indefinite.

I should state in the outset that Eugene Fitzpatrick, age eighteen, a son of defendant and a brother of the prosecutrix, was serving in the United States Army at the time of the trial, and returned to testify for his father.

An Assistant Attorney General was present and assisted the county attorney of Logan county in the trial of this case, which was ably prosecuted. Mention is made of this fact for the reason that by a slip of the tongue of defendant's attorney and the skillful cross-examination of the witness Eugene Fitzpatrick, he became confused as to the happenings on the date during the month of December, 1944, and the date of March 30, 1945. And while there are some discrepancies as to what actually

happened, and the dates thereof, a careful reading of the record as a whole clearly shows just what happened on each date, and what the real facts were. This will be clearly revealed as the evidence is considered.

The date alleged in the information and therefore relied upon by the state was March 30, 1945. The prosecutrix, Jeannine Fitzpatrick, testified that she was fifteen years of age on March 30, 1945. Her mother died April 26, 1945. She had two brothers and one sister, eighteen, eight and ten years of age, respectively. They were all living on a farm near Guthrie, in Logan County. She testified that the first act of intercourse was about a week after Christmas, in 1944. That it happened in her father's bedroom. It was in the nighttime, between 11 and 11:30. Her mother and older brother, Eugene, with some neighbor girls, Noma, Mildred and Pauline Lovelady, had gone opossum hunting. Her father had gone to town during the day with neighbors. He returned home between 11 and 12 o'clock, and she was in bed asleep, and that her younger brother, eight years of age, and her sister ten years of age were also in bed asleep. She testified that her father came to her bedroom door and asked her to get up and get him something to eat. She got up in her nightgown, and asked him what he wanted, "and he said he didn't want anything to eat." She then testified:

"A. I asked him what he wanted for supper and he said he didn't want any supper, that he wasn't hungry, and then he told me to go in his bedroom and I told him I was sleepy or something like that and didn't want to go in there, and he made me go in. Q. What do you mean by he made you go in? A. Well, he pushed me. Q. After he got you in the bedroom, what did he do? A. He told me to lay down on the bed and I wasn't going to do it. Q. Well, first, did he leave the door open or close it?

A. He closed it. Q. Tell the jury what he did? A. He said: 'Fatherly was the father that opened the daughter's womb.' Q. He told you that after he laid you on the bed? A. No, he told me that before. By Mr. Dinwiddie (attorney for defendant) : Objected to as assuming he laid her on the bed. (No ruling.) Q. Well, I thought she said he told her to get on the bed. After he made that statement, what did he do or say? A. He said that was a statement out of the Bible, and that is wasn't wrong. Q. And then what did he do? A. Then he told me to go on and lay down, and I told him I wasn't going to do it. And he pushed me on the bed and held me there. Q. Did he have sexual intercourse with you at that time and place? A. Yes, sir. Q. Did he hurt you? A. Yes, sir. Q. Did he hurt your private parts? A. Yes, sir."

When asked how long it took to complete the act, she said, "about ten or fifteen minutes." On cross-examination she said it was 15 or 20 minutes from the time he awoke her until this was all over and she was back in bed. She was then asked:

"Q. How long after you returned to bed before your brother Eugene and your mother returned from hunting? A. About five minutes."

She testified as to the second act being "out on a hay stack." Her testimony as to this act was as follows:

"Q. Where did the second act take place? A. Out at the hay stack. Q. Where was the haystack in respect to the house? A. It was about—it was over a half a block. Q. Tell the jury how that came about? A. He left the house and was gone quite a while, and he usually went up to the neighbors and I thought he had gone up there. Q. Who would that be? A. Lovelady's; and I went out to use the restroom. Q. By 'the restroom', you have reference to the toilet? A. Yes, sir. Q. Where is the toilet in respect to this haystack? A. It is between the house and the haystack. Q. Go ahead. A. And when

I saw him, I didn't think anything about it, and then he told me to come out by the hay pile, and I knew what he was going to do, and I— Q. You knew what he wanted? A. Yes, sir. By Mr. Dinwiddie: Objected to as calling for a conclusion. By the Court: Sustained. Q. Well, what did you and your father then do, where did you go? A. He made me go out to the haystack. Q. By 'haystack' do you mean a pile of loose hay or baled hay? A. It was baled hay. Q. What time of day or night was that? A. It was after dark, it had been dark quite a while. Q. Where was the rest of the family? A. In the house. Q. What time was it? A. It was at night, after dark. Q. And after you got to the hay pile or stack, what did he do then? A. He told me to lay down and I wasn't going to do it, and he made me. He pushed me down and held my hands, and— Q. And he had another second act of sexual intercourse with you? A. Yes, sir. By Mr. Dinwiddie: Objected to as leading. By the Court: Yes, don't lead the witness. Q. I believe you testified that after the second act, that you told your mother? A. Yes, sir. Q. About how long afterwards? A. It was the next day. Q. How many times after that did your father have an act of sexual intercourse with you? A. About four times."

Her evidence concerning the last time was as follows:

"Q. When was the last time he had an act of sexual intercourse with you? A. It was March 30th. Q. Of last year? A. Yes, sir. Q. How do you fix that time? A. My aunt and uncle from Wichita and my mother had gone to Muskogee. Q. What are their names, your aunt and uncle? A. Mr. and Mrs. Lloyd Parker. Q. Are they still living together, or do you know? A. I don't know. Q. I will ask you if you had gone to school that day? A. Yes, sir. Q. Where did you go to school? A. To Mulhall school. Q. Did Eugene go to school there too? A. Yes, sir. Q. And how about little Joe and Merlene? A. Yes, sir. Q. The four of you were all attending the public school at Mulhall? A. Yes, sir. Q. What time did you

get to the farm that evening after school? A. It was about 4:30, I would say. Q. When was school out? A. At 4 o'clock. Q. The bus carried you out home? A. Yes, sir. Q. After you reached home from school, what did you do then? A. I started washing the dishes. Q. What did your brother, Eugene do? A. He changed his clothes and went to relieve my father from plowing. Q. Do you know how far from the house it was to where your dad was plowing? A. It was about a quarter of a mile. Q. What kind of a plow and how was it operated? A. He had four horses on. Q. Was it a two-bottom plow? A. I don't know. By Mr. Dinwiddie: Objected to as immaterial (No ruling.) A. He always used four heads of horses. Q. How long was it, about, from the time Eugene went to relieve your dad who was plowing, until your dad arrived? A. I would say it was about 20 or 25 minutes. Q. Somewhere around 20 to 25 minutes? A. Yes, sir. Q. When your dad arrived at the house, what did he say or do? A. He told my little sister and brother to go gather the eggs and feed the chickens and get the chores done up and we would go to the show that night. Q. Who did that leave in the house? A. Just I and him. Q. And you testified your mother had gone to Muskogee? A. Yes, sir. Q. And Eugene was out plowing? A. Yes, sir. Q. And your little brother and sister were out doing the chores? A. Yes, sir. Q. Tell the jury what happened then? A. He told me to stop doing dishes and to go in his bedroom and I told him I wasn't going to do it, and he told me that he wouldn't give me any more lunch money or anything if I didn't; and I told him I didn't care, and he pushed me in his bedroom and then he told me to lay down, and I told him I wasn't going to do it, and he pushed me onto the bed, and then he had sexual intercourse with me, for the last time. Q. That was the last time? A. Yes, sir. Q. And how many times prior to that did he have sexual intercourse with you? A. About five times. Q. During this period of time from the first time to the last time, what, if anything, did your father ever say to you about your menstrual periods? A. He always wanted to know if they

were regular. Q. After you and your father had had this last act in the bedroom, what did you and he then do, yourselves? A. He went after the cows and I started doing dishes again, and he said I didn't need to fix any supper that night that we would go to town and eat. Q. What time did Eugene get back from the field? A. It was dusty dark, I would say. Q. I believe at that time the clock was stepped up an hour from what it is now? A. Yes, sir. Q. And after Eugene got back from the field, what, if anything, did he do? A. He unharnessed the horses and fed them and let them go, and my father had already got the cows in and had milked them and separated the milk. Q. How many cows was he milking, if you remember? A. I don't remember, but we never milked very many. Q. After your father completed the chores, what was done then? A. We got ready and started to town. Q. What was the purpose of going to town—to eat, and anything else? A. We were going to the show. Q. When was your mother due to return from Muskogee? A. We didn't know when she would come back. Q. State to the jury how you started to Guthrie from the farm. A. We were going in the pickup. Q. All of you? A. Yes, sir. Q. And which direction—tell the jury how you go to Guthrie? A. We went a quarter of a mile south and a mile west, and then a mile south and a mile west, and then we hit the pavement. Q. What I am getting at, how far had you gone before you met another car? A. We had gone about two miles. Q. The way you described your route? A. Yes, sir. Q. And after you went two miles, did you meet another car? A. Yes, sir. Q. Whose car was that? A. That was my aunt's and uncle's, and when we got down to the corner, daddy stopped and wanted to know if that was them, and Eugene said he thought it was, and we turned around and went back and when we got there, they were home. Q. When you got home, with your mother and your aunt and uncle, what was done? A. My mother prepared supper and then we went to bed."

The evidence then reveals that on the day following the death of her mother (April 26, 1945), the prosecutrix told her grandmother, Mrs. Mamie Price, of the acts of her father.

The charge in this case was filed on June 8, 1945. Soon thereafter prosecutrix went to Wichita, Kan., to live with her aunt and uncle, Mr. and Mrs. Lloyd Parker. She returned to Guthrie in a short while, to the home of her grandmother, because she did not get along with her aunt and uncle. She only stayed at the home of her grandmother a short time, and went to the home of another aunt, in Oklahoma City, but did not stay long and returned to the home of her grandmother in Guthrie. She stayed two or three weeks, and her grandmother got her a job at the Masonic Home, in Guthrie, as a diningroom waitress. Further reference to this will be made in the defendant's testimony.

On cross-examination prosecutrix testified that she had trouble with her father, and admitted that she at one time told her schoolteacher, Miss Hildreth, and a Mrs. Pritchett, that her father beat her with a hoe. Mrs. Pritchett testified for the defendant that prosecutrix had told this story when she was nine or ten years old, and that she had immediately examined her body, and found no evidence to substantiate the statement. Jeannine testified on cross-examination that her father was very strict on her, and that she did not like him very much for that. She further testified that when she left the Masonic Home in Guthrie she and another girl ran off and went to Kansas City, Mo. There she secured a job at the Katz Drug Store, and was working at the time she was picked up by the police at a rooming house where she and the girl were staying. They were returned to Guthrie, and under the supervision of Mrs. Mabel Bas-

sett, Commissioner of Charities and Corrections, prosecutrix was taken by the officers to a Catholic school at Sapulpa, where she was kept until taken to Guthrie to testify in this case.

The state on direct examination introduced in evidence, besides that of the prosecutrix, three witnesses: Dr. P. B. Gardner, Merlene Fitzpatrick, the ten-year-old sister, and Mrs. Mamie Price, the grandmother of prosecutrix.

Dr. Gardner was dead at the time of the trial, and by agreement of counsel, his recorded testimony, given at the time of the preliminary trial, was read to the jury. It was very short, and is as follows:

"Q. Your name is P. B. Gardner? A. Yes, sir. (Defendant admits qualifications) Q. Did you have occasion to make a vaginal examination of Jeannine Fitzpatrick? A. Yes. Q. Do you have the date? A. The 28th of April, 1945. Q. And from your examination, Doctor, I will ask you to state whether or not you have an opinion as to whether this girl had had sexual intercourse? A. Yes, sir, she had, I am sure."

This is the entire testimony of Dr. Gardner.

The next witness, Merlene Fitzpatrick, the ten-year-old sister of the prosecutrix, testified for the state. Her testimony is important when considering the evidence in the record which might corroborate the prosecutrix. I give it in full:

"Q. How old are you? A. Ten. Q. Can you tell the jury when your birthday was? A. March 16. Q. Where is your little brother, Joe? A. At home. Q. Is he sick? A. Yes, sir. Q. What is the matter with him? A. Has the measles. Q. When is little Joe's birthday? A. March 29. Q. Do you remember the day after his birthday a year ago when your mother and aunt and uncle went to

Muskogee? A. Yes. Q. Had you gone to school that day? A. Yes. Q. And how many of you went to school? A. Four. Q. Your brother Eugene and your sister Jeannine and your little brother Joe? A. Yes. Q. Is that right? A. Yes. Q. When you all came back from school on the schoolbus, where did your brother Eugene go? A. Went over across the creek. Q. Why did he go across the creek? (No answer.) Q. Can you tell the men why he went across the creek? A. He had to plow. Q. Was there anyone over there plowing? A. No. Q. What was that? A. Daddy. Q. When Eugene went over there, did your daddy come up to the house? A. Yes, sir. Q. Do you know about how long it was? A. No, sir. Q. When your daddy came back to the house, what, if anything, did he tell you to do? A. He told me to go out and gather the eggs. Q. Did anybody go with you? A. Joe—he did. Q. Little Joe? A. Yes, sir. Q. How many eggs did you gather? A. Half a bucket. Q. Can you tell these men about where you went to hunt the eggs? A. In the chicken house and out there by the toilet and around the turkey pen. Q. And did you do anything else besides gather and hunt the eggs? A. I fed the chickens. Q. Where was your daddy and Jeannine while you and Joe were doing that? A. In the house. Q. Was anyone else in the house? A. No, sir. Q. What time did Eugene get back from the field? A. About dark. Q. And he left right after he got off of the schoolbus and changed his clothes, is that right? A. Yes, sir. Q. And didn't get back until almost dark, is that right? A. Yes. Q. After you and Joe had fed the chickens and gathered the eggs, what did you do then? A. Went to the house. Q. Did you see your daddy and Jeannine? A. No, sir. Q. Do you know where they were? A. No, sir. Q. Did you go near the bedroom? A. No, sir. Q. Did you see either of them leave the house after they went in the house? A. No, sir. Q. Was the bedroom door closed? A. I don't remember. Q. You didn't pay any attention to the bedroom? A. No, sir. Q. Did you leave the kitchen to go to any other part of the house? A. No, sir. Q. You merely went in the back

door into the kitchen and out? A. Yes, sir." (No cross-examination.)

Mamie Price, grandmother of the prosecutrix, testified that right after the death of her daughter (April 26, 1945), she had a talk with the prosecutrix in which she told her of the relation between herself and her father. They then told Rosemary, her daughter. On cross-examination she testified that she had trouble with prosecutrix about her conduct while she was staying at her home, and that prosecutrix wrote her "an awful bad" letter, and made accusations against her; and that she left and went to work at the Masonic Home at Guthrie.

This was all of the testimony offered by the state on direct examination.

The defendant testified in his own behalf that he was a farmer and livestock dealer in Logan county. He denied having intercourse with his daughter at any time. With reference to the act charged just after Christmas, 1944, he testified that he had gone to Guthrie on that date in his pickup. He was accompanied by two of his neighbors, Mr. Lovelady and Mr. Mayes. They returned home late at night, somewhere between 11 and 12 o'clock. After letting his neighbors out, he went on to his home. His wife and older son, Eugene, with some neighbor girls, Pauline Lovelady Mayes and Mildred Lovelady, had gone opossum hunting. They returned to the house, arriving there only a few minutes after he had arrived. He recalled they had an opossum which they had caught. When he went into the house he awoke his daughter and asked her if she would prepare him something to eat, but she said she was too sleepy. He was building a fire in the kitchen stove when the hunting party returned, and his wife fixed him something to eat.

He specifically denied any violation of the prosecutrix. With reference to the date of March 30, 1945, he testified that when the children returned from school he was plowing about a quarter of a mile from the house, with a gang plow and four head of horses. His son Eugene came to where he was plowing and asked him what he wanted him to do. He told him that the rest of the folks (his wife and Mr. and Mrs. Parker of Wichita, who were visiting them) were figuring on going fishing when they returned, and for Eugene to go ahead and get some fish bait, and do up the chores; that the folks would soon return from Muskogee, and they would go fishing. Eugene returned to the house and he kept on plowing and did not go to the house until quitting time. That upon his return to the house Eugene had done up the chores. He unharnessed his horses, and fed them. He then went to the house to get supper, but the folks had not returned from Muskogee, so they decided to go to town, thinking the folks had changed their minds and stopped in town. They had only gone about two miles when they saw a car going cast. He was not sure whether it was the folks returning from Muskogee, and he and Eugene discussed it and decided it was. They turned back and went home, and when they got there, his wife and Mr. and Mrs. Parker were at home. His wife prepared supper and he and Mr. Parker and Eugene went fishing. He recalled that they had bought some shrimp for bait, and that Eugene had dug some worms. Some of the "Stuck" boys who were neighbors accompanied them. They returned from the fishing trip about midnight. His wife and Mrs. Parker were sitting up waiting for them. Jeannine, the prosecutrix, and one of the neighbor girls—a Stuck girl,—had disappeared, and had not come home. Eugene and his mother went down the road looking for them, and they finally

came in. He specifically denied the acts as testified to by the prosecutrix on this date, or at any other time. He testified that she was very high-tempered and hard to get along with, and that she often resented his questioning of conduct, and at one time stated that he had beaten her with a hoe when he had not touched her. The defendant testified that his wife at one time told him that prosecutrix had complained to her of his conduct, and he asked his wife "to ask her about that in front of me." That she did so. This testimony was:

"What, if anything did you say to her in front of the mother, and what did Jeannine say? A. Well her mother asked her about it, and I says, 'tell her, tell her the truth and she will be satisfied.' Q. What did she tell her mother then? A. She said nothing like that never happened, and 'what is the matter with you, mama, are you crazy?' "

He testified that he told the officers about this statement when he was arrested.

Eugene Fitzpatrick, 18 years of age, testified for the defendant. He corroborated in every detail the testimony of the defendant as to his actions and whereabouts on the date just after Christmas, 1944, and March 30, 1945. It is unnecessary to give the details of his testimony. He said that he had never at any time known of any intimate relations between his father and his sister. He testified that when they returned from hunting on the night in December, he was accompanied home by his mother, Pauline Mayes and Mildred Lovelady. Just as they were about a quarter of a block from the house, he saw his father's car drive in. It was about midnight. Witness had made a short cut, and was about 30 feet ahead of the other members of the hunting party. He went by the window and saw his father building a fire in the kitch-

en stove. He laid his gun down on the side of the porch and waited for the others to come up, and they all went into the house together. His mother fixed something to eat. It was only a very few minutes from the time he saw the car drive in, and the time they all entered the house, and the defendant could not have been there from 20 to 30 minutes, as testified to by the prosecutrix.

After questioning this witness in detail about what transpired "in December," the occasion of the opossum hunt, defendant's attorney asked him:

"Q. On one other occasion, she testified absolutely, she testified you came home from school December 30th, the date of this charge, and that her father did this to her that evening. What did you do when you came home that evening?"

"December 30th" was plainly an error on the part of the attorney, and he intended to say "March 30th." "The date of this charge" was March 30, 1945. They had attended school on March 30th, and nothing is said about them being in school in December. The events subsequently testified about by this witness, as well as those related by prosecutrix and the defendant, transpired on March 30th. Witness testified that his mother, aunt and uncle had gone to Muskogee on that date, and that after they returned, he and his father, uncle and some neighbor boys went fishing. On cross-examination by the Assistant Attorney General, this witness testified:

"Q. When was that time when you went passum hunting? A. It was in December. Q. What time in December? A. I am not sure, but I believe it was the 30th. Q. You think it was the 30th. By what do you fix the time? A. All I know, it was in December. Q. All you know, it was in December? A. Yes, sir. Q. But you don't know what time in December? A. No sir, I don't.

Q. And you say it was on December 30th that you came back from school and went down there— By Mr. Dinwiddie: Objected to as a misstatement of the evidence. By the Court: Overruled. (Exception.) By Mr. Lattimore: That was your question to him and he answered it. By the Court: Go ahead. Q. He asked you a while ago on December 30th that you came back from school and went down there when your father told you to go get the fish bait. Was that December 30th? A. I believe that is the time that the folks went to Muskogee. Q. What was the date? A. December 30th."

As above stated, all the testimony of both the state and defendant shows that the 'possum hunt was the latter part of December, 1944, and the other date, the one they went fishing, was March 30, 1945.

Pauline Lovelady Mayes testified concerning the night they went hunting; and further testified that as they were returning to the Fitzpatrick home she saw the Fitzpatrick car "come into the house." That they were not over a half or three-quarters of a block from the house when she saw the car drive in. That they immediately went to the house, and it could not have taken them over two and a half minutes. It could not possibly have taken them 20 to 25 minutes, the time testified to by the prosecutrix. She saw the defendant as she came into the house, and he was building a fire in the cook stove in the kitchen. This witness testified:

"Q. This girl testified that he drove in on that particular night you were all possum hunting and got a big possum, whether it was December 30 or March 30, and that he came in her bedroom and talked to her about five minutes and had sexual connection with her ten or fifteen minutes, and that it was about five minutes after she went back to bed when you folks came in from hunting. Is that right or not? A. That is not right."

Mrs. Ed Pritchett testified for the defendant, told of the prosecutrix telling her that her father had beaten her with a hoe; that she made an examination of her body over her protest, and did not find any marks. She also was asked:

"Q. Do you have the means of knowing and do you know what her general reputation has been for truth and veracity? A. Yes, I know. Q. Is it good or bad? A. Bad."

Mrs. Viola Lovelady testified that the was a neighbor of the Fitzpatricks, she knew Jeannine, the prosecutrix, and that her general reputation for truth and veracity in the community was bad.

Mrs. Margaret Smith testified that she had been employed at the Masonic Home in Guthrie while prosecutrix worked there for about three months, and that her general reputation for truth and veracity in that community was bad. On cross-examination she said her testimony was based upon what people who worked at the Home said about Jeannine.

Glen Sawyer testified that he was the manager of the Masonic Home at Guthrie. When asked if he knew the general reputation of the prosecutrix for truth and veracity, the court sustained an objection to the question on the ground that the time she was at the Home was after the information was filed.

Mrs. Morris McNeal testified that she had known prosecutrix in the community near Mulhall since she was three years old; that her reputation for truth and veracity in that community was bad. On cross-examination she testified that her opinion was based upon statements made by the residents of that community prior to and since this case was filed.

The state on rebuttal offered as a witness Mollie Stuck who testified that the general reputation of prosecutrix for truth and veracity was good. The testimony of Mrs. R. L. Hogan, formerly Hildreth, and one of Jeannine's teachers at Mulhall, was to the same effect.

The prosecutrix was recalled, and questioned with reference to telling her teachers that her father had beaten her with a hoe, and of her being sent down to the sheriff. The sheriff did not appear as a witness.

Both the state and the defendant rested.

The jury returned a verdict of guilty, and assessed the punishment of defendant at imprisonment in the State Penitentiary for ten years.

From the above statement of facts as deduced from the record, we are confronted with the general proposition that in the trial of criminal cases the verdict of the jury will not be set aside when there is a conflict in the evidence or where the evidence is sufficient to sustain the judgment and sentence; and the rule as above stated that, in cases of this character, the testimony of the prosecutrix should not only be clear and convincing, but should not bear upon its face inherent improbability that she be not impeached or substantially contradicted. Otherwise, it will be necessary that her testimony be corroborated; and with the further rule that the court will, in cases of this character, closely scrutinize the testimony upon which the judgment and sentence is based.

As hereinbefore stated, the facts in the instant case fully justify the application of the rule that the testimony of the prosecutrix should be corroborated. She has not only been substantially contradicted in her testimony, in my opinion, but she has also been impeached as to her

reputation for truth and veracity by many who had a very good opportunity to know.

Let us first review the record as to the evidence offered by the state to corroborate the evidence of the prosecutrix. It must come from three witnesses. The testimony of her little ten-year-old sister has been set out in full in this dissenting opinion. It has specific reference to the occurrence on March 30, 1945. In the first place, she is very young, but this does not preclude the fact that she could tell the truth and was doing so. However, it can also be assumed that by reason of her age and inexperience she could very easily make statements or come to conclusions that may not be in accord with the true facts. To properly judge this, we must take into consideration all of the facts and circumstances surrounding the situation at the time about which she testified. Her testimony with reference to the actions of her brother Eugene as above set out was that "he went over across the creek," and that "he had to plow." When asked: "When Eugene went over there, did your daddy come back to the house?" She answered "Yes, sir", but she did not know how long it was. She then testified to gathering the eggs and feeding the chickens as directed by her father, and that her daddy and prosecutrix remained in the house while she and her little brother were doing these chores. She did not see them after her return to the house. At the very best, this evidence only presented "opportunity", and this court held in the case of Self v. State, supra: "It may be said in passing that opportunity may be considered as one of the circumstances in a rape case, but it is not corroboration. In several cases it has been held that the mere opportunity to commit the crime of rape is not sufficient corroboration of the testimony of the prosecutrix that rape was

committed. State v. Brundidge, 204 Iowa, 111, 214 N. W. 569; Robbins v. State, 106 Neb. 423, 184 N. W. 53; People v. Brehm, 218 App. Div. 266, 218 N. Y. S. 469; State v. Bowker, 40 Idaho 74, 231 P. 706."

See, also, Weston v. State, supra.

Mamie Price, the grandmother of prosecutrix, testified that prosecutrix told her of the occurrence the day after her daughter died, April 26, 1945. The record reveals the circumstances under which it was told. A review of her evidence has heretofore been given. There was nothing in it to in any way corroborate the prosecutrix as to the actual facts at the time alleged.

The only witness who could be considered as giving corroborating evidence was Dr. Gardner. He was only asked four questions. He did not examine prosecutrix until April 28, 1945. This was about 30 days after the last act as testified to by the prosecutrix. His answer was: "Yes, sir, she had, I am sure." No questions were asked him as to the condition of the prosecutrix, as to whether the hymen had been ruptured. His only material answer was a conclusion, and no facts were stated. He had died after attending the preliminary hearing, and his evidence was read to the jury by agreement of counsel.

In many cases that have been before this court, eminent physicians have testified that there was no way to positively determine that the hymen had been ruptured by intercourse. There are many other methods by which this could happen. The facts and circumstances may be presented surrounding the particular case, and that the act of having intercourse was one of the ways to puncture the hymen, but it is impossible to determine that the rupture of the hymen was by intercourse.

In the case of Self v. State, supra, two duly licensed and practicing physicians testified to facts stronger than in the instant case as to the absence of the hymen and that in their opinion prosecutrix had had intercourse, and the court, quoting from the case of People v. Brehm, supra [218 App. Div. 266, 218 N. Y. S. 470], said:

"Proof of absence of the hymen day after alleged statutory rape and opportunity, together held not to constitute corroboration of prosecutrix."

With the application of the rules of law thus announced there was absolutely no corroboration of the testimony of the prosecutrix in this case. In addition to this, there was an absolute denial of her testimony by the defendant, and his testimony was corroborated in every detail by his 18 year-old son, Eugene Fitzpatrick. The time and circumstances on the date alleged in the information, and the night at the haystack, when reviewed in the light of all the evidence in the record, is such that it is unbelieveable. It is contradicted not only by the defendant and his son Eugene, but by the disinterested witness Pauline Lovelady Mayes. According to her testimony, which corroborated Eugene Fitzpatrick, it would have been impossible for the act to have been committed after Christmas of 1944, as testified to by the prosecutrix.

The act at the haystack, according to the testimony of the prosecutrix, occurred at a point about half a block from the house, about dark, and at a time when the mother of prosecutrix and other members of the family, including her brother Eugene, were in the house. She made no outcry. She did not tell her mother or anyone else of the occurrence and outrage when she returned to the house. These facts, under the circumstances, are almost

unbelieveable; and especially when she testified that her father held her and forcibly outraged her.

The prosecutrix herself corroborates the testimony of the defendant and Eugene in every detail except as to the acts of intercourse, and in addition to this, a number of substantial men and women who had known the prosecutrix for many years testified that her reputation for truth and veracity was bad. Under this state of facts, should this defendant be deprived of his liberty and incarcerated in the penitentiary of this state for a period of ten years? I think not.

In this connection I desire to call attention to a few expressions of learned jurists who have had years of experience in the trial and hearing of cases of this character.

In the early case of Morris v. State, supra, Judge Doyle, speaking for this court, said [9 Okla. Cr. 241, 131 P. 735]:

"This court does not hold with some that, as a matter of law, rape cannot be established by the uncorroborated testimony of the prosecutrix, but in common with all courts recognizes that, without such corroboration, her testimony must be clear and convincing. And where the testimony of the prosecutrix bears upon its face inherent evidence of improbability, there should be corroboration by other evidence, connecting the defendant with the commission of the crime. The law is that the life or liberty of a citizen shall be taken only in case the right to do so is established beyond all reasonable doubt; and while there is no rule of law which forbids a jury to convict of rape on the uncorroborated testimony of the prosecutrix, provided they are satisfied beyond a reasonable doubt of the truth of her testimony, yet the courts have always recognized the danger of conviction on her uncorroborated testimony, and the testimony of the prosecutrix, if inherently improbable and uncorrobo-

rated, will not justify or support a conviction; as the only reasonable conclusion in such cases is that such verdicts are the result of passion or prejudice, and therefore contrary to law."

And in the case of Ferbrache v. State, supra, it was said:

"Under the laws of this state, conviction for rape may be had on the uncorroborated testimony of the prosecutrix; but when her testimony is contradictory, and the defendant testifies and denies specifically the testimony of the prosecutrix, and his testimony is corroborated, the testimony of the prosecutrix, standing alone, is not sufficient to warrant a conviction."

It was stated by Judge Doyle in the case of Self v. State, supra [62 Okla. Cr. 208, 70 P. 2d 1093]:

"Aside from the testimony of the prosecutrix, there was no evidence whatever tending to corroborate her testimony as to the several acts, and there was no evidence whatever tending to show the surrounding circumstances or facts of prior and subsequent acts of intercourse between the prosecutrix and the defendant. She stated that the first act and the last act were committed at Tell, Tex. This is the only detail as to time or place of said occurrence. No testimony was given by her as to the particulars and there was no direct evidence showing penetration.

"It also appears that she made no complaint of injury or mistreatment on the part of the defendant until over eight months had elapsed from the date alleged in the information that the act charged occurred."

See also the cases of Sowers v. Territory, 6 Okla. 436, 50 P. 257, by the Territorial court; and Weston v. State, supra, and cases cited therein. These are all stronger cases of acts than the instant case, yet they were reversed. The Sowers and Weston cases had many facts similar to those in the case at bar.

In the Weston case, supra, it was said [77 Okla. Cr. 51, 138 P. 2d 560]:

"While reviewing the evidence, it cannot but be observed that the evidence of the prosecutrix was not corroborated to that degree which would justify this court in affirming this case. One cannot read this record without coming to the conclusion that this verdict was the result of passion and prejudice. It is not for us to say as to the guilt or innocence of the defendant, only to see that he has a fair and impartial trial, and the evidence is such, under the law, as justifies the taking of his liberty for a period of 15 years."

This case well sustains the great principle of law announced, and so often quoted in the law books, of Sir Matthew Hale:

"It is true that rape is a most detestable crime, and therefore to be severely punished, with death; but it must be remembered that it is an accusation easily to be made, and hard to be proved, and harder to be defended by the party accused, though ever so innocent."

It may also be noted that the majority opinion refers to certain evidence as being corroborative, when as a matter of fact it was evidence given by the prosecutrix herself. This has special reference to the Bible quotation hereinbefore referred to and quoted in the majority opinion; and to the testimony of the prosecutrix as to her father speaking to her of the regularity of her menstrual periods, and that her father told her he would not give her lunch money. These were all statements of the prosecutrix.

The majority opinion also refers to the fact that the mother of prosecutrix committed suicide as an act of corroboration. The record reveals that Mrs. Viola Lovelady, a disinterested witness, testified that the mother told her before she died that "she thought Jeannine was

going to the bad." It seems to me that the inference could well be drawn from this statement that Jeannine was acting in a wrong way with someone other than her father.

With reference to the testimony of the witness Eugene Fitzpatrick, the 18-year-old brother of prosecutrix, with reference to his going to Wichita to see his sister before she testified, I fail to see how this incident could have in any way been corroborative of the testimony of the prosecutrix. His testimony was:

"Q. Was that at the request of your father, or your own volition? A. It was my own. Q. What was your business up there? A. I didn't believe anything ever happened like they said and I was going up to have her tell the truth, and nothing but the truth."

This evidence, to my mind, could in no way be construed against the defendant. This soldier boy had come many miles to testify in behalf of his father and it is largely upon his testimony, contradictory of every material fact testified to by the prosecutrix, that I have based my opinion in this case. It rings too true and corroborates his father's testimony in every detail. So does the testimony of Pauline Lovelady Mayes, a disinterested witness, according to whose testimony the act could not have been committed on March 30, as testified to by the prosecutrix.

This is one of those cases where the judges do not see alike, and this ends the story. I am of the opinion that under the law and the facts of the case, the testimony of the prosecutrix should have been corroborated, and that the evidence is not such as to corroborate her in accord with the decisions of this court hereinbefore cited.